# UNITED STATES *v.* REORGANIZED CF&I FABRICATORS OF UTAH, INC., ET AL.

No. 95–325.   Argued March 25, 1996—Decided June 20, 1996

SOUTER, J., delivered the opinion for a unanimous Court with respect to Part III, the opinion of the Court with respect to Parts I, II–A, II–B,

and II–C, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, GINSBURG, and BREYER, JJ., joined, and the opinion of the Court with respect to Part II–D, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 229.

*Kent L. Jones* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Argrett, Deputy Solicitor General Wallace, Gary D. Gray,* and *Kenneth W. Rosenberg.*

*Steven J. McCardell* argued the cause for respondents. With him on the brief were *Stephen M. Tumblin* and *Frank Cummings.**

JUSTICE SOUTER delivered the opinion of the Court.†

This case presents two questions affecting the priority of an unsecured claim in bankruptcy to collect an exaction under 26 U. S. C. § 4971(a), requiring a payment to the Internal Revenue Service equal to 10 percent of any accumulated funding deficiency of certain pension plans: first, whether the exaction is an "excise tax" for purposes of 11 U. S. C. § 507(a)(7)(E) (1988 ed.),[1] which at the time relevant here gave seventh priority to a claim for such a tax; and, second, whether principles of equitable subordination support a cate-

---

**James J. Keightley, William G. Beyer, James J. Armbruster, Kenneth J. Cooper,* and *Charles G. Cole* filed a brief for the Pension Benefit Guaranty Corporation as *amicus curiae* urging reversal.

*Richard M. Seltzer, Bernard Kleiman, Carl B. Frankel, Paul Whitehead,* and *Karin Feldman* filed a brief for the United Steelworkers of America, AFL–CIO, as *amicus curiae* urging affirmance.

†JUSTICE SCALIA joins all but Part II–D of this opinion.

[1] Section 304(c) of the Bankruptcy Reform Act of 1994, 108 Stat. 4132, added a new seventh priority and moved the provision relevant here from seventh (§ 507(a)(7)) to eighth priority (§ 507(a)(8)), without altering any of the language germane to this case. The parties agree that this change from seventh to eighth priority does not affect this case because it arose under the pre-1994 Bankruptcy Code, and we accordingly refer to the provision in question as § 507(a)(7), to reflect its codification at the time in question.

gorical rule placing § 4971 claims at a lower priority than unsecured claims generally. We hold that § 4971(a) does not create an excise tax within the meaning of § 507(a)(7)(E), but that categorical subordination of the Government's claim to those of other unsecured creditors was error.

I

The CF&I Steel Corporation and its nine subsidiaries (CF&I) sponsored two pension plans, with the consequence that CF&I was obligated by the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 935, 29 U. S. C. § 1001 *et seq.*, to make certain annual minimum funding contributions to the plans based on the value of the benefits earned by its employees. See § 1082; 26 U. S. C. § 412. The annual payments were due each September 15th for the preceding plan year, see 26 CFR § 11.412(c)–12(b) (1995), and on September 15, 1990, CF&I was required to pay a total of some $12.4 million for the year ending December 31, 1989. The day passed without any such payment, and on November 7, 1990, CF&I petitioned the United States Bankruptcy Court for the District of Utah for relief under Chapter 11 of the Bankruptcy Code, in an attempt at financial reorganization prompted in large part by the company's inability to fund the pension plans. *In re CF&I Fabricators of Utah, Inc.,* 148 B. R. 332, 334 (Bkrtcy. Ct. CD Utah 1992).

In 1991, the IRS filed several proofs of claim for tax liabilities, one of which arose under 26 U. S. C. § 4971(a), imposing a 10 percent "tax" (of $1.24 million here) on any "accumulated funding deficiency" of certain pension plans.[2] The

---

[2] The Government also filed a claim under § 4971(b), which imposes an exaction of 100 percent of the accumulated funding deficiency if the deficiency is not corrected before the notice of deficiency under § 4971(a) is mailed or the exaction under § 4971(a) is assessed. For the plan year ending December 31, 1989, the claimed tax liability under § 4971(b) was thus $12.4 million. In addition, the Government filed a claim for an accumulated funding deficiency for the plan year ending December 31, 1990, in the approximate amount of $25.6 million ($12.4 million for 1989 plus an

Government sought priority for the claim, either as an "excise tax" within the meaning of 11 U. S. C. § 507(a)(7)(E) (1988 ed.), or as a tax penalty in compensation for pecuniary loss under § 507(a)(7)(G). CF&I disputed each alternative, and by separate adversary complaint asked the Bankruptcy Court to subordinate the § 4971 claim to those of general unsecured creditors.

The Bankruptcy Court allowed the Government's claim under § 4971(a) but denied it any priority under § 507(a)(7), finding the liability neither an "excise tax" under § 507(a)(7)(E) nor a tax penalty in compensation for actual pecuniary loss under § 507(a)(7)(G). Instead, the court read § 4971 as creating a noncompensatory penalty, 148 B. R., at 340, and by subsequent order subordinated the claim to those of all other general unsecured creditors, on the supposed authority of the Bankruptcy Code's provision for equitable subordination, 11 U. S. C. § 510(c).

The Government appealed to the District Court for the District of Utah, pressing its excise tax theory and objecting to equitable subordination as improper in the absence of Government misconduct. While that appeal was pending, CF&I presented the Bankruptcy Court with a reorganization plan that put the § 4971 claim in what the plan called Class 13, a special category giving lowest priority (and no money) to claims for nonpecuniary loss penalties; but it also provided that, if the court found subordination behind general unsecured claims to be inappropriate, the § 4971 claim would be ranked with them in what the reorganization plan

---

additional deficiency of $13.2 million for 1990); the liability claimed under § 4971(a) for 1990 was therefore $2.56 million, and under § 4971(b) the full $25.6 million. The Bankruptcy Court disallowed all of these additional claims (for reasons not pertinent here), see *In re CF&I Fabricators of Utah, Inc.*, 148 B. R. 332, 341 (Bkrtcy. Ct. CD Utah 1992), and the Government has not sought review of its ruling. Thus, though the Government filed four § 4971 claims in the Bankruptcy Court, we focus on the one at issue here, the § 4971(a) claim for the deficiency in the 1989 plan year.

called Class 12 (which would receive some funds). Appellees' App. in No. 94–4034 et al. (CA10), pp. 96–101, 137–141, 197–200. The United States objected, but the Bankruptcy Court affirmed the plan. The Government appealed this order as well, and the District Court affirmed both the denial of excise tax treatment and the subsequent subordination to general unsecured claims. App. to Pet. for Cert. A–11. The Tenth Circuit likewise affirmed. 53 F. 3d 1155 (1995).

We granted certiorari, 516 U. S. 1005 (1995), to resolve a conflict among the Circuits over whether § 4971(a) claims are excise taxes within the meaning of § 507(a)(7)(E), and whether such claims are categorically subject to equitable subordination under § 510(c).[3] We affirm on the first question but on the second vacate the judgment and remand.

## II

The provisions for priorities among a bankrupt debtor's claimants are found in 11 U. S. C. § 507, subsection (a)(7) of which read, in relevant part, that seventh priority would be accorded to

> "allowed unsecured claims of governmental units, only to the extent that such claims are for—
>
> .           .           .           .           .
>
> "(E) an excise tax on—
>   "(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or
>   "(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition."

---

[3] Compare *In re Mansfield Tire & Rubber Co.*, 942 F. 2d 1055 (CA6 1991), cert. denied *sub nom. Krugliak* v. *United States*, 502 U. S. 1092 (1992), with *In re Cassidy*, 983 F. 2d 161 (CA10 1992); *In re C–T of Va., Inc.*, 977 F. 2d 137 (CA4 1992).

What the Government here claims to be an excise tax obligation arose under 26 U. S. C. § 4971(a), which provides that

> "[f]or each taxable year of an employer who maintains a [pension] plan . . . there is hereby imposed a tax of 10 percent (5 percent in the case of a multiemployer plan) on the amount of the accumulated funding deficiency under the plan, determined as of the end of the plan year ending with or within such taxable year."

No one denies that Congress could have included a provision in the Bankruptcy Code calling a § 4971 exaction an excise tax (thereby affording it the priority claimed by the Government); the only question is whether the exaction ought to be treated as a tax (and, if so, an excise) without some such dispositive direction.

## A

Here and there in the Bankruptcy Code Congress has included specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes. Some bankruptcy provisions deal specifically with subjects as identified by terms defined outside the Bankruptcy Code; 11 U. S. C. § 523(a)(13), for example, addresses "restitution issued under title 18, United States Code," and § 507(a)(1) refers to "any fees and charges assessed against the estate under chapter 123 of title 28." Other bankruptcy provisions directly adopt definitions contained in other statutes; thus §§ 761(5), (7), and (8) adopt the Commodity Exchange Act's definitions of "commodity option," "contract market," "contract of sale," and so on. Not surprisingly, there are places where the Bankruptcy Code makes referential use of the Internal Revenue Code, as 11 U. S. C. § 101(41)(C)(i) does in referring to "an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code," and as § 346(g)(1)(C) does in providing for recognition of a gain or loss "to the

same extent that such transfer results in the recognition of gain or loss under section 371 of the Internal Revenue Code."

It is significant, therefore, that Congress included no such reference in § 507(a)(7)(E), even though the Bankruptcy Code itself provides no definition of "excise," "tax," or "excise tax." This absence of any explicit connector between §§ 507(a)(7)(E) and 4971 is all the more revealing in light of the following history of interpretive practice in determining whether a "tax" so called in the statute creating it is also a "tax" (as distinct from a debt or penalty) for the purpose of setting the priority of a claim under the bankruptcy laws.

## B

Although § 507(a)(7), giving seventh priority to several different kinds of taxes, was enacted as part of the Bankruptcy Act of 1978, 92 Stat. 2590 (1978 Act), a priority provision for taxes was nothing new. Section 64(a) of the Bankruptcy Act of 1898 (1898 Act), which governed (as frequently amended) until 1978, gave priority to "taxes legally due and owing by the bankrupt to the United States [or a] State, county, district, or municipality." 30 Stat. 544, 563.[4] On a number of occasions, this Court considered whether a particular exaction, whether or not called a "tax" in the statute creating it, was a tax for purposes of § 64(a), and in every one of those cases the Court looked behind the label placed on the exaction and rested its answer directly on the operation of the provision using the term in question.

The earliest such cases involved state taxes and are exemplified by *City of New York* v. *Feiring,* 313 U. S. 283 (1941). In considering whether a New York sales tax was a "tax" entitled to priority under § 64(a), the Court placed no weight on the "tax" label in the New York law, and looked to the

___

[4] This provision was modified slightly between 1898 and 1978, most notably in 1938, when it was moved to § 64(a)(4) (and given fourth priority) and amended to apply to "taxes legally due and owing by the bankrupt to the United States or any State or any subdivision thereof." 52 Stat. 874.

state statute only "to ascertain whether its incidents are such as to constitute a tax within the meaning of § 64." *Id.,* at 285. See also *New Jersey* v. *Anderson,* 203 U. S. 483, 492 (1906); *New York* v. *Jersawit,* 263 U. S. 493, 495–496 (1924). The Court later followed the same course when a federal statute created the exaction. In *United States* v. *New York,* 315 U. S. 510 (1942), the Court considered whether "'tax[es]'" so called in two federal statutes, *id.,* at 512, n. 2, were entitled to priority as "taxes" under § 64(a). In each instance the decision turned on the actual effects of the exactions, *id.,* at 514–517, with the Court citing *Feiring* and *Anderson* as authority for its enquiry. 315 U. S., at 514–516. See also *United States* v. *Childs,* 266 U. S. 304, 309–310 (1924); *United States* v. *Sotelo,* 436 U. S. 268, 275 (1978) ("We . . . cannot agree with the Court of Appeals that the 'penalty' language of Internal Revenue Code § 6672 is dispositive of the status of respondent's debt under Bankruptcy Act § 17(a)(1)(e)").[5]

Congress could, of course, have intended a different interpretive method for reading terms used in the Bankruptcy Code it created in 1978. But if it had so intended we would expect some statutory indication, see *Midlantic Nat. Bank* v. *New Jersey Dept. of Environmental Protection,* 474 U. S. 494, 501 (1986), whereas the most obvious statutory indicator is very much to the contrary: in the specific instances noted before, it would have been redundant for Congress to refer

---

[5] As the Court stated in a different context: "Although the statute . . . terms the money demanded as 'a further sum,' and does not describe it as a penalty, still the use of those words does not change the nature and character of the enactment. Congress may enact that such a provision shall not be considered as a penalty or in the nature of one, . . . and it is the duty of the court to be governed by such statutory direction, but the intrinsic nature of the provision remains, and, in the absence of any declaration by Congress affecting the manner in which the provision shall be treated, courts must decide the matter in accordance with their views of the nature of the act." *Helwig* v. *United States,* 188 U. S. 605, 612–613 (1903).

specifically to Internal Revenue Code definitions of given terms if such cross-identity were to be assumed or presumed, as a matter of interpretive course.

While the Government does not directly challenge the continuing vitality of the cases in the *Feiring* line, it seeks to sidestep them by arguing, first, that similarities between the plain texts of §§ 4971 and 507(a)(7)(E) resolve this case. This approach, however, is inconsistent with *New York* and *Sotelo*, in each of which the Court refused to rely on the terminology used in the relevant tax and bankruptcy provisions.[6] The argument is also unavailing on its own terms, for even if we were to accept the proposition that comparable use of similar terms is dispositive, the Government's plain text argument still would fail.

The word "excise" appears nowhere in § 4971 (whereas, by contrast, 26 U. S. C. § 4401 explicitly states that it imposes "an excise tax"). And although there is one reference to "excise taxes" that applies to § 4971 in the heading of the subtitle covering that section ("Subtitle D—Miscellaneous Excise Taxes"), the Government disclaims any reliance on that caption. Tr. of Oral Arg. 14, 17–20; see also 26 U. S. C. § 7806(b) ("No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision or portion of this title"). Furthermore, though § 4971(a) does explicitly refer to its exaction as a "tax," the Government disavows any suggestion that this language is dispositive as to whether § 4971(a) is a tax for purposes of § 507(a)(7)(E); while

---

[6] JUSTICE THOMAS's suggestion that no case "has denied bankruptcy priority to a congressionally enacted tax," *post*, at 230, is true, but not on point. *United States* v. *New York*, 315 U. S., at 514–517, employed the *Feiring-Anderson* analysis to the exactions at issue there; the Court did not rely on the label that Congress gave. See also *United States* v. *Sotelo*, 436 U. S., at 275; *United States* v. *Childs*, 266 U. S. 304, 309–310 (1924). The Court's conclusion that the exactions functioned as taxes does not change the fact that it employed a functional analysis.

§4971(b) "impos[es] a tax equal to 100 percent of [the] accumulated funding deficiency to the extent not corrected," the Government says that this explicit language does not answer the question whether §4971(b) is, in fact, a tax under §507(a)(7)(E). Reply Brief for United States 13–14; Tr. of Oral Arg. 19–24. The Government's positions, then, undermine its suggestion that the statutes' texts standing together demonstrate that §4971(a) imposes an excise tax.

The Government's second effort to avoid a *New York* and *Sotelo* interpretive enquiry relies on a statement from the legislative history of the 1978 Act, that "[a]ll Federal, State or local taxes generally considered or expressly treated as excises are covered by" §507(a)(7)(E). 124 Cong. Rec. 32416 (1978) (remarks of Rep. Edwards); *id.*, at 34016 (remarks of Sen. DeConcini). But even taking this statement as authoritative, it would provide little support for the Government's position. Although the statement may mean that all exactions called[7] "excise taxes" should be covered by §507(a)(7)(E),[8] §4971 does not call its exaction an excise tax. And although the section occurs in a subtitle with a heading of "Miscellaneous Excise Taxes," the Government has disclaimed reliance on the subtitle heading as authority for its position in this case, recognizing the provision of 26 U. S. C. §7806(b) that no inference of legislative construction should be drawn from the placement of a provision in the Internal Revenue Code. See *supra*, at 222 and this page; Tr. of Oral Arg. 19. If, on the other hand, the statement in the legisla-

---

[7] Assuming that an exaction would not be "generally considered" an excise tax unless it would be reasonable to consider it such, the possible application of this first prong of the legislators' statement of intent is answered by the analysis of §4971, below.

[8] It should be noted, though, that such an interpretation may prove too much: the Government suggests that this statement from the legislative history does not affect the rule of construction that courts will look behind the denomination of state and local taxes, Reply Brief for United States 6, n. 4, but it is difficult to read that sentence as applying one rule for federal taxes and another for state and local ones.

tive history is read more literally, its apparent upshot is that, among those exactions that are taxes, the ones that are expressly treated as excises are "excise tax[es]" within the meaning of § 507(a)(7)(E). But that proposition fails, of course, to answer the question whether the exaction is a tax to begin with.

In sum, we conclude that the 1978 Act reveals no congressional intent to reject generally the interpretive principle that characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context, and no specific provision that would relieve us from making a functional examination of § 4971(a). We proceed to that examination.

## C

*Anderson* and *New York* applied the same test in determining whether an exaction was a tax under § 64(a), or a penalty or debt: "a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government." *Anderson*, 203 U. S., at 492; *New York*, 315 U. S., at 515; accord, *Feiring*, 313 U. S., at 285 ("§ 64 extends to those pecuniary burdens laid upon individuals or their property . . . for the purpose of defraying the expenses of government or of undertakings authorized by it"). Or, as the Court noted in a somewhat different context, "[a] tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act." *United States* v. *La Franca*, 282 U. S. 568, 572 (1931).

We take *La Franca*'s statement of the distinction to be sufficient for the decision of this case; if the concept of penalty means anything, it means punishment for an unlawful act or omission, and a punishment for an unlawful omission is what this exaction is. Title 29 U. S. C. § 1082 requires a pension plan sponsor to fund potential plan liability according to a complex statutory formula, see also 26 U. S. C. § 412, and 26 U. S. C. § 4971(a) requires employers who maintain a

pension plan to pay the Government 10 percent of any accumulated funding deficiency. If the employer fails to correct the deficiency before the earlier of a notice of deficiency under § 4971(a) or an assessment of the § 4971(a) exaction, the employer is obligated to pay an additional "tax" of 100 percent of the accumulated funding deficiency. § 4971(b).[9] The obviously penal character of these exactions is underscored by other provisions, including one giving the Pension Benefit Guaranty Corporation (PBGC) an entirely independent claim against the employer for "the total amount of the unfunded benefit liabilities," 29 U. S. C. § 1362(b)(1)(A) (a claim which in this case the PBGC has asserted and which is still pending, see *Pension Benefit Guaranty Corporation* v. *Reorganized CF&I Fabricators of Utah, Inc.*, 179 B. R. 704 (ND Utah 1994)); see also §§ 1306–1307. We are, indeed, unable to find any provision in the statutory scheme that would cast the "tax" at issue here in anything but this punitive light.

## D

The legislative history reflects the statute's punitive character:

---

[9] The Government contends that § 4971(b) is more similar to a penalty than § 4971(a) is, because the Secretary of the Treasury can waive liability under the former but not the latter. The suggestion is that the Secretary can waive the imposition of the 100 percent tax, under ERISA § 3002(b), 88 Stat. 997, or can eliminate a violation by reducing the employer's funding requirement, see 26 U. S. C. § 412(d); see also 29 U. S. C. § 1083(a). But §§ 412(d) and 1083(a) provide for waiver of the minimum funding requirements, so their application would avoid a violation of either §§ 4971(a) or (b); there simply would be no "accumulated funding deficiency" for purposes of either §§ 4971(a) or (b). Thus the Government is incorrect in suggesting that the Secretary has the ability to waive the exaction under § 4971(b) but not under § 4971(a).

More fundamentally, even if the Secretary could waive only § 4971(b), it is not clear why this would make any difference, as the exaction would still serve to reinforce a federal prohibition.

"The bill also provides new and more effective penalties where employers fail to meet the funding standards. In the past, an attempt has been made to enforce the relatively weak funding standards existing under present law by providing for immediate vesting of the employees' rights, to the extent funded, under plans which do not meet these standards. This procedure, however, has proved to be defective since it does not directly penalize those responsible for the underfunding. For this reason, the bill places the obligation for funding and the penalty for underfunding on the person on whom it belongs—namely, the employer." H. R. Rep. No. 93–807, p. 28 (1974).

Accord, S. Rep. No. 93–383, p. 24 (1973). The Committee Reports also stated that, "[s]ince the employer remains liable for the contributions necessary to meet the funding standards even after the payment of the excise taxes, it is anticipated that few, if any, employers will willfully violate these standards." H. R. Rep. No. 93–807, *supra*, at 28; S. Rep. No. 93–383, *supra*, at 24–25.

Given the patently punitive function of § 4971, we conclude that § 4971 must be treated as imposing a penalty, not authorizing a tax. Accordingly, we hold that the "tax" under § 4971(a) was not entitled to seventh priority as an "excise tax" under § 507(a)(7)(E), but instead is, for bankruptcy purposes, a penalty to be dealt with as an ordinary, unsecured claim.

### III

Hence, the next question: whether the Court of Appeals improperly subordinated the Government's § 4971 claim to those of the other general unsecured creditors. Though we have rejected the argument that the § 4971 claim is for an "excise tax" within the meaning of § 507(a)(7)(E), both parties agree that the § 4971 claim is allowable on a nonpriority

unsecured basis.[10]  CF&I's reorganization plan did not lump all unsecured claims in one nonpriority class, however, but instead created four classes of unsecured creditors, only the first two of which would receive funds: Class 11 comprised small claims ($1,500 or less) grouped together for administrative convenience, see 11 U. S. C. § 1122(b); Class 12 comprised general unsecured claims (except for those assigned to other classes); Class 13 covered the § 4971 claim and some other (much smaller) subordinated penalty claims; and Class 14, claims between the CF&I Steel Corporation and its subsidiaries (all of which were bankrupt), the net value of which was zero.  The plan provided, nonetheless, that if a court determined that a Class 13 claim should not be subordinated, or that the Class 13 claims should not be separately classified, the claim or claims would be placed in Class 12.  Appellees' App. in No. 94–4034 et al., at 95–101, 137–141, 196–200.

When the Government challenged the proposal to subordinate its claim, the Bankruptcy Court confirmed the reorganization plan, App. to Pet. for Cert. A–31, and ordered that the § 4971 claim be "subordinated to the claims of all other general unsecured creditors of [CF&I] pursuant to 11 U. S. C. § 510(c)."  *Id.*, at A–21.  The District Court subsequently ruled that the § 4971 claim "should be equitably subordinated to the claims of the general creditors under Section 510(c)."  *Id.*, at A–18.  In the Tenth Circuit, the Government again contested subordination under § 510(c), which CF&I defended, even as it sought to sustain the Bankruptcy Court's result with two new, alternative arguments: first, that 11 U. S. C. § 1122(a), restricting a given class to substantially similar claims, prohibited placement of the § 4971 claim in Class 12, because of its dissimilarity to other

---

[10] Cf. § 57(j) of the 1898 Act, 30 Stat. 561 ("Debts owing to the United States, a State, a county, a district, or a municipality as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose").

unsecured claims; and second, that, because 11 U. S. C. § 1129(a)(7) authorizes creditors with impaired claims (*i. e.*, those getting less than full payment under the plan, like those in Class 12 here) to reject a plan that would give them less than they would get from a Chapter 7 liquidation, courts must have the power to assign a claim the same priority it would have in a Chapter 7 liquidation (in which a noncompensatory prepetition penalty claim would be subordinated, 11 U. S. C. § 726(a)(4)). The Court of Appeals addressed neither of these arguments, however, relying instead on the broad construction given § 510(c) in *In re Virtual Network Servs. Corp.*, 902 F. 2d 1246 (CA7 1990) (subordinating a claim otherwise entitled to priority under § 507(a)(7) to those of general unsecured creditors), and holding specifically that "section 510(c)(1) does not require a finding of claimant misconduct to subordinate nonpecuniary loss tax penalty claims." 53 F. 3d, at 1159. The Court of Appeals took note of the Bankruptcy Court's finding that "[d]eclining to subordinate the IRS's penalty claim would harm innocent creditors rather than punish the debtor" and concluded that "the bankruptcy court correctly addressed the equities in this case." *Ibid.*

Nothing in the opinion of the Court of Appeals (or, for that matter, in the rulings of the Bankruptcy Court and the District Court) addresses the arguments that the Bankruptcy Court's result was sustainable without reliance on § 510(c). The court never suggested that either § 1122(a) or the Chapter 7 liquidation provisions were relevant. We thus necessarily review the subordination on the assumption that the Court of Appeals placed no reliance on the possibility that the Bankruptcy Code might permit the subordination on any basis except equitable subordination under § 510(c).

So understood, the subordination was error. In *United States* v. *Noland*, 517 U. S. 535 (1996), we reversed a judgment said to rely on § 510(c) when the subordination turned

on nothing other than the very characteristic that entitled the Government's claim to priority under §§ 507(a)(1) and 503(b)(1)(C). We held that the subordination fell beyond the scope of a court's authority under the doctrine of equitable subordination, because categorical subordination at the same level of generality assumed by Congress in establishing relative priorities among creditors was tantamount to a legislative act and therefore was outside the scope of any leeway under § 510(c) for judicial development of the equitable subordination doctrine. See *id.*, at 543. Of course it is true that *Noland* passed on the subordination from a higher priority class to the residual category of general unsecured creditors at the end of the line, whereas here the subordination was imposed upon a disfavored subgroup within the residual category. But the principle of *Noland* has nothing to do with transfer between classes, as distinct from ranking within one of them. The principle is simply that categorical reordering of priorities that takes place at the legislative level of consideration is beyond the scope of judicial authority to order equitable subordination under § 510(c). The order in this case was as much a violation of that principle as *Noland*'s order was.

Without passing on the merits of CF&I's arguments that the § 4971 claim is not similar to the other unsecured claims and that courts dealing with Chapter 11 plans should be guided by Chapter 7 provisions, we vacate the judgment of the Court of Appeals, and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, concurring in part and dissenting in part.

I agree with the majority that the Bankruptcy Court improperly relied on 11 U. S. C. § 510(c) to subordinate the United States' claims, and I join Part III of the Court's opinion. I cannot agree, however, with the majority's determi-

nation that assessments under 26 U. S. C. § 4971(a) are not "excise taxes" within the meaning of 11 U. S. C. § 507(a)(7)(E) (1988 ed.). I would hold that every congressionally enacted tax that is generally considered an excise tax is entitled to bankruptcy priority under § 507(a)(7)(E).

Section 507(a)(7)(E) creates a bankruptcy priority for excise taxes. Congress, in enacting § 4971, purported to enact a tax, see 26 U. S. C. § 4971(a) ("[T]here is hereby imposed a tax . . ."), and the tax it enacted is properly considered an excise tax. See *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S. 152, 161 (1993) (stating, in dicta, that § 4971 imposes an excise tax). It is true that *New Jersey* v. *Anderson*, 203 U. S. 483 (1906), and its progeny held that whether a state assessment is entitled to bankruptcy priority as a tax is a federal question. See *id.*, at 492; *City of New York* v. *Feiring*, 313 U. S. 283, 285 (1941). It is not appropriate, however, for federal courts to perform a similar inquiry into valid taxes passed by Congress, and the majority cites no case in which this Court has denied bankruptcy priority to a congressionally enacted tax. I respectfully dissent.