**In re SENDMYGIFT.COM, INC., Debtor.**

No. 00–35021.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

July 3, 2002.

David Hoiland, Minneapolis, MN, for SendMyGift.com.

Ralph V. Mitchell, Minneapolis, MN, for Steve & Charlene Houle, Jean Peterson, Jere & Suzanne Peterson, and Chad Lofton.

Ryan Burt, Minneapolis, MN, for Charles & Roxanne England and Peter & Linda Stencel.

ORDER RE: DEBTOR'S OBJECTIONS TO CLAIMS FILED BY CERTAIN SHAREHOLDERS (CLAIMS NOS. 76, 77, 78, 79, 52 AND 88)

GREGORY F. KISHEL, Chief Judge.

This Chapter 11 case is before the Court on the Debtor's objections to the claims filed by certain of the Debtor's shareholders: Steve and Charlene Houle (claim no. 76), Jean Peterson (claim no. 77), Chad Lofton (claim no. 78), Jere and Suzanne Peterson (claim no. 79), Charles and Roxanne England (claim no. 52), and Peter and Linda Stencel (claim no. 88). The Debtor appears by its attorney, David Hoiland. The Houles, the Petersons, and Lofton appear by their attorney, Ralph V. Mitchell. The Englands and the Stencels appear by their attorney, Ryan Burt. Upon the memoranda and argument of counsel and the relevant portions of the file in this case, the Court makes the following memorandum decision.

## BACKGROUND

The Debtor, SendMyGift.com, Inc., is a business corporation that filed a voluntary petition under Chapter 11 on December 20, 2000. Joseph Burnett was its original promoter; he is presently its sole employee, officer, and director. When Burnett organized the Debtor in 1998, his business plan was to establish a "dot-com company" to carry on retail, registry-based sales of jewelry and gifts through a site on the World Wide Web. The Debtor registered a domain name for a site and commenced development of a complex software platform to support its planned presence and operation on the Web.

To capitalize its startup, the Debtor raised approximately $5,000,000.00 in cash from individual investors; it also received in-kind contributions of real estate. The investors were issued shares of stock in the corporation. In consideration for the later issuance of another block of stock, the Debtor took an in-kind payment of another parcel of real estate, located in Rochester, Minnesota, on which was located a multi-unit housing development composed of former military barracks buildings. Ultimately, the Debtor had over 400 shareholders.

In mid–1999, the Debtor purchased a retail jewelry store on the downtown Minneapolis skywalk. Throughout 1999 and 2000, the Debtor operated this store and managed the Rochester apartment complex while it continued to develop its website. It also purchased a commercial office building in Burnsville, Minnesota, as a planned headquarters for the on-line business. By late 2000, however, it ran out of startup capital. Its business revenues were insufficient to fund the commencement of its Internet-based retail operation. Burnett hoped to stem the Debtor's foundering by using the proceeds of a planned sale of the Rochester real estate, but the sale fell through. After a secured creditor repossessed the jewelry inventory at the Minneapolis store, the Debtor filed its Chapter 11 petition.

Since its Chapter 11 filing, the Debtor has liquidated various parcels of real estate under court authorization, including the Burnsville and Rochester properties, and has paid the creditors that held liens against those properties. It holds the remaining proceeds on deposit pending the outcome of this case. The proceeds may be sufficient to enable the Debtor to pay all of its unsecured trade creditors in full, a rarity in a bankruptcy case.

The Debtor has retained ownership of its developed but still-unused software platform. Most recently, it contemplates the recovery of some value from it via the sale of non-exclusive licenses to use it. The Debtor has filed successive versions of a plan; proceedings on the approval of a disclosure statement are pending.

## MATTERS AT BAR

After this case was commenced, a number of the Debtor's shareholders filed proofs of claim under which they asserted a right to payment as holders of claims against the Debtor. Via a combined and very generic request for disallowance in full, the Debtor objected to these claims and others.

Of all of the affected shareholder-claimants, only two groups engaged counsel. They separately responded to the Debtor's objections: the Houles, Jean Peterson, Chad Lofton, and Jere and Suzanne Peterson on the one hand (collectively referred to as "the Houle/Peterson/Lofton group"), and the Englands and the Stencels on the other (collectively referred as "the Eng-

land/Stencel group").[1] After an initial hearing and further scheduling by the Court, the issues implicated by the Debtor's objections have been narrowed, identified, and presented for decision.

## RELEVANT FACTS AND CIRCUMSTANCES

The issue here is legal in character, the substantive consequence of the parties' posture in proceedings in this and other courts. As a result, the relevant "facts" are not historical in origin or nature; identifying them requires no more than a summary of the recitations in various court records.

The members of the Houle/Peterson/Lofton group filed their proofs of claim on May 15, 2001. All four proofs of claim recited the same basis for an unsecured claim: "Recission [sic] of stock purchase." All included copies of stock certificates naming the specific claimants. The amounts of the individual claims were stated.[2] The signatory on all four proofs of claim was the legal counsel for the group's members.

It is undisputed that the members of the Houle/Peterson/Lofton group were shareholders of the Debtor as of the date of its Chapter 11 filing. Nothing in the record suggests that they had obtained a judgment for rescission or damages in a court proceeding against the Debtor, or had even commenced a lawsuit for such relief. It will be assumed for the purposes of this decision that none of the Houle/Peterson/Lofton group had obtained such an adjudication.

In their submissions here, however, the members of this group complain that agents and principals of the Debtor made fraudulent misrepresentations of fact to induce them to make their equity investments in the Debtor. They insist that the securities laws and the common law of fraud would entitle them to rescind their stock purchases or to recover money damages from the Debtor, were the Debtor not in bankruptcy.

In the second group, the Englands filed their proof of claim on April 27, 2001. They asserted a claim in the amount of $115,911.48, alleging that it arose on October 8, 1999, from "Securities Fraud/Common Law Fraud." On August 7, 2001, the Stencels filed a proof of claim with the same recitations, to assert a claim in the amount of $46,499.06.

In July 2000, the Englands and the Stencels had commenced suit against the Debtor, Burnett, and Brian Cox (the Debtor's former chief financial officer) in the Minnesota State District Court for the First Judicial District, Dakota County. The suit apparently sounded under the Minnesota state securities laws and common-law and equitable theories. Counsel entered an appearance on behalf of the Debtor in the action. Early on, the England/Stencel group made a Rule 36 request for admissions to Burnett and the Debtor. On February 22, 2000, the Dakota County District Court entered an order to deem admitted the fact averments in the request. By a separate order entered on the same date, it granted a money judgment against Burnett.

---

1. Only one of the other affected shareholders responded to the Debtor's objections; that one filed a response *pro se* but did not appear at the hearing. Nonetheless, the Court reserved disposition on all of the shareholder-claimants' contested claims pending the entry of the present order.

2. Specifically, $60,000.00 for the Houles, $25,010.00 for Jean Peterson, $82,500.00 for Lofton, and $30,015.00 for Jere Peterson.

The Englands and the Stencels also moved for summary judgment against the Debtor, premised on the deemed admissions. That matter remained pending until May 22, 2001. On that date, the Dakota County District Court entered an order granting a money judgment against Cox. In the text of this order, the court acknowledged the Debtor's Chapter 11 filing. It directed that proceedings against the Debtor be held in abeyance pending a grant of relief from stay from this Court. The Englands and the Stencels have never requested such relief in this forum. Judgment has not been entered against the Debtor in the Dakota County District Court.[3]

## DISCUSSION

## I. THEORY OF DEBTOR'S OBJECTION

In his original memorandum, the Debtor's counsel set forth the substantive basis for his client's objection to all of the claims filed by shareholders:

3. The Stencels' claim was not among those named in the Debtor's "omnibus" objections, probably because it did not appear on the clerk's claims docket when the Debtor's counsel prepared and filed the objections. In a footnote in the Englands' initial response, their counsel alleged that the Stencels had submitted a proof of claim to the clerk on April 27, 2001, but that it "was not docketed and after investigation, was apparently misplaced by the Court." Counsel acknowledged that the Debtor had not objected to the Stencels' claim yet. Though the Debtor still has not formally done so, all submissions and arguments from both sides were phrased as if it had. There may be an issue of some sort here, but it will not be treated until raised. For the purposes of this order, the status of the Stencels' claim will be determined under the theories in the Debtor's prior objection, without prejudice to the raising of any other contention in the future.

§ 510 of the Bankruptcy Code prohibits shareholders' claims from being granted the priority status of unsecured claims. Shareholders' claims should be treated, for purposes of any plan of reorganization, as shareholder claims, regardless of whether or not those shareholders made claims for securities fraud or the like.

It was not clear from this statement how the Debtor's position would translate into a final configuration of rights for the affected shareholders. Supplemental brief and oral argument has clarified the Debtor's position as follows: The claims asserted on the face of the shareholders' proofs of claim should be disallowed. Those parties would not be entitled to share pro rata with non-shareholder creditors that have general unsecured claims, when the Debtor distributes the funds it has accumulated. Rather, such shareholder-claimants would be relegated to a status equal to that of all of the Debtor's other shareholders—that is, they would "be granted the same priority as common stock" in the Debtor, left intact as holders of equity interests in the reorganized corporate entity.[4]

4. This summary accords a bit of charity to the argument as last presented. Counsel's specific wording is:
 ... The Debtor requests that the Court disallow all unsecured claims filed by stockholders arising from the purchase or sale of their common stock, and further order that all claims filed by shareholders based on rescission or damages arising from the purchase of stock in the Debtor be granted the same priority as common stock.
 In a very real way, this configuration of relief would be internally inconsistent. If a claim is *disallowed,* and if the disallowance is complete and unqualified, the claim is not to be recognized at all as a right to be paid in money in the course of performance under the plan. It is simply *gone* from the little post-confirmation universe. This does not mean that the ostensible claimants under securities-fraud theories would be *gone,* however. The Debtor's objection does not challenge their pre-existing status as holders of inter-

To some extent, this proposal finessed the shareholder-claimants' central point—that they had a continuing right under nonbankruptcy law to divest their equity positions and to be made whole in money for their investments, because they had been fraudulently induced to assume the equity positions in the first place. In its original memorandum, the Debtor seemed to recognize the point, when it stated that its plan would leave "shareholder rights *and claims* unimpaired" (emphasis added). This statement was not further refined or qualified; nonetheless, it could fairly be read as contemplating that dissenting shareholders asserting claims under the securities laws would retain a right to seek rescission or damages. The Debtor's later submissions on these claim objections have not spoken to the issue, however.

## II. ISSUES RAISED BY SHARE-HOLDER–CLAIMANTS' RESPONSES

The Houle/Peterson/Lofton group and the England/Stencel group answered the Debtor's objections separately, and via different legal theories. The first group's argument is the more broadly founded, and arguably applies to both groups' claims; thus, it is more appropriately treated first. The other's, characterizing its members' positions as "unique," will be deferred.

### A. Houle/Peterson/Lofton Group's Response

The members of the Houle/Peterson/Lofton Group make a two-step response to the Debtor's objection.

First, they claim that they have the right under nonbankruptcy law to rescind their purchases of stock in the Debtor—to undo the sale transaction and to receive their cash consideration back. Though they have not received a court judgment premised on findings that establish their legal right to do so, they maintain that they have all the proof to merit one. Hence, they say, they can demand their payment right now, and have made that demand by filing their proofs of claim. In their view, this entitles them to be treated for all further purposes in this case as claimants, and not shareholders, absent a sustained objection to their claims on their merits. Since the Debtor has not objected to their claims on their merits under nonbankruptcy law, argue the members of this group, the Debtor is not entitled to have their claims "disallowed" at this point.

The Houle/Peterson/Lofton group's second point is that the Debtor is out of bounds in asking for subordination at this point; it argues that the relative priority and treatment of its members' claims are issues for the process of plan confirmation, far outside the substantive scope of the claims objection process.

Under the complex of procedure governing the allowance of claims in bankruptcy cases, the Houle/Peterson/Lofton group is correct in its first point.

▮ A claim that is asserted in a bankruptcy case through the filing of a proof of claim is deemed allowed, unless a party in interest objects. 11 U.S.C. § 502(a); *In re Gran*, 964 F.2d 822, 826

---

ests. There is only one outcome for a pre-confirmation process that would fix that status while comporting with due process and the structure of Chapter 11: survival of the equity interest, unaltered. As a matter of semantics, at least, the Debtor errs in the way it describes the contemplated basis for the affected parties' future participation in the

case; if the asserted right to payment in money is gone, then there is no longer a "claim" to be placed on a hierarchy of treatment. The thought here probably was focused on *prioritization*, not characterization. The only sound way to analyze the request is to ignore the erroneous nomenclature and to treat it as such.

(8th Cir.1992). In turn, "[a] proof of claim which comports with the requirements of Bankruptcy Rule 3001(f) constitutes *prima facie* evidence of the validity and amount of the claim." *In re Brown,* 82 F.3d 801, 805 (8th Cir.1996) (quoting *In re Hemingway Transport, Inc.,* 993 F.2d 915, 925 (1st Cir.1993); interior quotation marks omitted). *See also In re Be–Mac Transport Co., Inc.,* 83 F.3d 1020, 1025 (8th Cir.1996); *In re McDaniel,* 264 B.R. 531, 533 (8th Cir. BAP 2001); *In re Waterman,* 248 B.R. 567, 571 (8th Cir. BAP 2000); *In re Consumers Realty & Dev. Co., Inc.,* 238 B.R. 418, 422–423 (8th Cir. BAP 1999). To rebut the "presumptive validity" of the asserted claim, the objector must bring forward "substantial evidence." *In re Brown,* 82 F.3d at 805. This will shift a burden of production back to the claimant. *In re Gran,* 964 F.2d at 827. At this point, the claimant must satisfy the requirements of the nonbankruptcy law that originally governed the claim, as to the weight of the evidence and the burden of persuasion. *Raleigh v. Illinois Dept. of Rev.,* 530 U.S. 15, 120 S.Ct. 1951, 1956, 147 L.Ed.2d 13 (2000).

■ In the first stage of this process, however, the bankruptcy court defers to the "probative force" of a creditor's proof claim and any supporting documentation required or voluntarily submitted with it. This deference goes so far as to assume all findings of fact and conclusions of law that would be prerequisites to the creditor's recovery on the claim outside of bankruptcy—even if those predicates are not recited on the face of the proof of claim. *In re Brown,* 82 F.3d at 805 (in context of proceeding on objection to filed tax claim, government could rely in first instance on Internal Revenue Service's proof of claim "and was not required to plead specially, give notice, or produce evidence that the corporations were the alter egos of the debtors" for the purposes of proving claim in individual debtors' bankruptcy case; filing of proofs of claim alone gave government the benefit of legal theory of piercing of the corporate veil, and shifted burden to debtors to produce evidence that corporations had been maintained as separate legal entities).

■ Here, the members of the Houle/Peterson/Lofton group staked out their position in fact and law by filing proofs of claim with certain averments—that they were defrauded in the purchase of their equity shareholding in the debtor and had a right to their money back. The averments on the proofs of claim were just that terse, but under the rule and caselaw this was enough to meet their initial burden. It established them as holders of claims against the estate. If the Debtor wishes to avoid that result—*i.e.,* if it wishes to have them formally classified as shareholders, rather than as claimants—it must shoulder its burden of production, and must muster evidence going to the elements of fraud and loss that underlie the claims. It has not done so yet. Until it does, the members of the Houle/Peterson/Lofton group will have the status of claimants in this case.

Via its other request, the Debtor seeks a declaratory judgment as to the priority to be accorded the claims or interests of shareholders like the members of the Houle/Peterson/Lofton group. This request sounds directly under § 510(b). The statute provides, in pertinent part:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor ..., [or] for damages arising from the purchase or sale of such a security ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such

security is common stock, such claim has the same priority as common stock.

As will be seen, a direct application of this statute at the present stage of this case would be premature. Because the parties have so entangled the substantive with the procedural in their arguments, however, some discussion of the meat of the statute is appropriate.

▮▮▮ This provision was enacted to settle competing claims to priority in the distribution of assets out of the bankruptcy estate of a corporate debtor, or from a reorganizing corporate debtor's future revenues or other post-confirmation means. In application, it affects a small number of constituencies; it functions in the borderland between the classes of general unsecured creditors and equity security holders. Both of those groups fall on the lower rungs of priority under bankruptcy and non-bankruptcy law, equity below unsecured creditors. *E.g. In re Betacom of Phoenix, Inc.*, 225 B.R. 703, 706 (D.Ariz. 1998), (describing operation of "absolute priority rule" in bankruptcy); *In re Granite Partners, L.P.*, 208 B.R. 332, 344 (Bankr.S.D.N.Y.1997); (ditto); MINN.STAT. § 302A.753 (setting priorities for distribution of value from winding-up of corporation's business).

Congress identified the very issue, and enunciated its policy considerations, in the legislative history to the Bankruptcy Code of 1978:

> A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a purchase: Should he be treated as a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated?

H.R.REP. No. 595, 95th Cong., 1st Sess. 194 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6154.

In passing on this issue, Congress identified the factors it thought were controlling: the reasonable expectations as to priority that a prospective investor-shareholder would have harbored originally, versus those of the general trade creditor, and the nature of the risks initially assumed by both.[5]

> Whether the rescinding security holder should be subordinated to, share *pari passu* with, or have priority over, unsecured creditors requires consideration of the elements of restitutionary relief.... Professors Slain and Kripke ... conclude ... that rules of allocation in bankruptcy should be predicated on allocation of risk. The two risks to be considered are the risk of insolvency of the debtor and the risk of an unlawful issuance of securities. While both security holders and general creditors assume the risk of insolvency, Slain and Kripke conclude that the risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors. Placing rescinding share holders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.

---

**5.** The name-references in the following quotation identify an early academic commentary on the issue: Slain & Kripke, *The Interface Between Securities Regulation and Bankrupt-* *cy: Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors,* 48 N.Y.U.L.REV. 261 (1973).

. . .

> The bill generally adopts the Slain/Kripke position, but does so in a matter that is administratively more workable.

*Id.* at 195–196. *See also In re Stylesite Mktg., Inc.,* 253 B.R. 503, 510–512 (Bankr. S.D.N.Y.2000) (applying risk-assumption analysis to hold that subordination under § 510(b) could apply to shareholder's request for imposition of constructive trust against debtor corporation's assets); *In re Granite Partners, L.P.,* 336–339 and 342–344 (doing same to claim for damages for debtor's continuing "fraudulent maintenance" of misrepresentation originally made in connection with purchase of securities); *In re American Solar King Corp.,* 90 B.R. 808–819 (Bankr.W.D.Tex.1988) (doing same to claim arising out of "short sale" of securities in debtor).

▬ Some courts have observed that the statute prevents a canny shareholder from "bootstrapping" its equity claim "simply by alleging fraud, rescission, or some other tort theory in the sale of the security" after the bankruptcy filing, or in anticipation of it. *In re Washington Bancorporation,* 1996 WL 148533, at \*19 (D.D.C.1996); *In re Cincinnati Microwave, Inc.,* 210 B.R. 130, 133 (Bankr. S.D.Ohio 1997). The remedy, however, is not limited to cases of intentional manipulation of the bankruptcy process; if the elements of the statute are present, subordination is mandatory for contriving and good-faith rescinders alike, because the legislative history and the plain language of § 510(b) require it. *In re Basin Resources Corp.,* 190 B.R. 824, 826 (Bankr. N.D.Tex.1996).

▬ None of these authorities speak to the procedural context in which a determination under § 510(b) is to be made. When one looks at the "big picture" of a Chapter 11 case, it is clear that the propriety, application, and effect of this subordination are not ripe until a plan is presented for confirmation and that plan invokes the statute through its classification and treatment of the stakes of rescinding shareholders. The reason is a bit involved, but it readily follows from the structure of the Code. Section 510(b) establishes its priorities "[f]or the purpose of distribution." In a Chapter 11 case, a plan of reorganization is the vehicle by which the distribution from assets or post-confirmation revenues is specified. The plan does so via specified "treatments"—the delineation of the nature and priority of the rights each constituency is to have after confirmation. *E.g.,* 11 U.S.C. § 1123(a)(1) (plan shall "designate . . . classes of claims, . . . and classes of interests"); 1123(a)(3) (plan shall "specify the treatment of any class of claims or interests that is impaired under the plan"); and 1129(a)(7)(A)(ii), 1129(a)(7)(B), 1129(a)(9), and 1129(b)(2)(A)–(C) (setting out minimum requirements for treatment of claims and interests under plan—*i.e.,* what the debtor must pay or otherwise afford holders thereof after confirmation). In turn, confirmation is the process by which that specification is legally fixed. 11 U.S.C. § 1141(a) (provisions of a confirmed plan bind debtor, equity security holders, creditors, etc.).

▬ As counsel for the Houle/Peterson/Lofton group points out, the treatment of rescinding shareholders' claims under a plan is a matter different from the threshold issue of whether they have claims as such. The threshold issue is now resolved, because § 510(b) does not furnish a substantive basis for disallowing the claims and because the Debtor has not objected to them on their merits. The relative priority of the claims is an aspect of treatment, and its legal propriety is a matter for the confirmation process. It should be presented under plan terms that are more

fine-tuned than those in the last filed version of the Debtor's plan, in light of today's adjudication.[6]

The outcome of the Debtor's objection to the claims of the Houle/Peterson/Lofton group, then, is as follows: for now, they have allowed claims, until such time as a party in interest objects to them on their merits and the objection is sustained.[7] The question of whether they are to be subordinated under § 510(b), and to what other claims or interests, may be addressed by the Debtor in its proposed classification and treatment of them. On objection by an affected shareholder, the merits of the Debtor's proposal under § 510(b) will be gauged.

### B. Issue "Unique" to England/Stencel Group

The members of the England/Stencel group received money judgments against two of the Debtor's officers on the same legal theories they had advanced against the Debtor, based on deemed admissions of fact. They claim the benefit of the same deemed admissions against the Debtor. They also propound a derivative liability in the Debtor, on account of the adjudged liability in the two officers, and premised on an agent-principal relationship running from them to the Debtor. As they note, only the automatic stay in bankruptcy prevented them from using this platform to fix and liquidate their claims for money damages against the Debtor. Finally, they point out that they com-

menced their litigation against the Debtor some 17 months before the Debtor's bankruptcy filing, and prosecuted it in a good faith belief that the Debtor had the solvency to respond to judgment.

These circumstances, they argue, exempt them from any subordination or disallowance otherwise mandated by § 510(b). The thought seems to be that they were within a veritable hair's-breadth of achieving the status of holders of general unsecured claims evidenced by a final judgment; that they had not sought that status with an eye toward "bootstrapping" their position in a bankruptcy case; and that "equity" should give them the full benefit of an assertion of remedies that was stymied only by the Debtor's bankruptcy filing.

 In the first place, this argument must fail because it does not recognize the scope of § 510(b). The reduction of a rescinding shareholder's demand to a claim—a "right to payment" in money, under the definition of § 101(5)(A)—and even the evidencing of such a claim by a judgment for the recovery of money do not, *per se*, confer an immunity from subordination. By the very words of § 510(b), its remedy lies against "claim[s] arising from rescission" *and* claims "for damages." The statute does not distinguish claims by former shareholders that are fixed and liquidated by judgment from those that are only asserted but not adjudicated; all of them are subject to subordination. Thus, even had

---

6. The choice of the word "relative" is not accidental; arguments already raised by the Houle/Peterson/Lofton group bode further complications on the matter of priority. Its members seek a separate classification and a priority between general unsecured creditors and non-rescinding shareholders. They rely on a theory set forth in a case from another court, *In re Drexel Burnham Lambert Group, Inc.*, 140 B.R. 347 (S.D.N.Y.1992), and academic commentary on it, N. Georgakopoulos,

*Strange Subordinations: Correcting Bankruptcy's § 510(b)*, 16 BANKR.DEV.J. 91 (1999).

7. All other dissenting shareholders who filed similar claims will have the same status, as will the members of the England/Stencel group as to this threshold issue. The Debtor's objections to the claims of rescinding shareholders who did not respond to the Debtors objection will be disposed of in a separate, more summary order.

the England/Stencel group received its judgment against the Debtor—or even were it deemed to have the equivalent of one—its members' claims are still subject to § 510(b).[8]

■ Even if one assumes the predicate construction of § 510(b), however, this argument fails on its own structure. The theory, essentially, is that the Debtor is barred from having the members of the England/Stencel group classified and treated as shareholders, because they had properly invoked legal remedies to divest themselves of that status. While not expressly articulated as such, this argument implicates the so-called "preclusion doctrines," the precepts of judicature that are designed to ensure finality of judgments and to prevent repetitious litigation. The specific doctrine that would apply here is *res judicata*, or "claim preclusion," because the dispute entails the full resolution of an identified legal cause of action rather than isolated, subsidiary findings of fact or conclusions of law.[9] This court is obligated under the federal Full Faith and Credit Act, 28 U.S.C. § 1738, to apply the Minnesota state law of claim preclusion. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–482, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Minneapolis Community Dev. Agency v. Buchanan*, 268 F.3d 562, 566 (8th Cir.2001); *Haberer v. Wood-*

*bury County*, 188 F.3d 957, 961 (8th Cir. 1999); *Tolefree v. City of Kansas City*, 980 F.2d 1171, 1173–1174 (8th Cir.1992). As framed by the Minnesota Supreme Court, *res judicata* requires a prior judgment on the merits of a claim, which was final under the rules of its forum. *State v. Joseph*, 636 N.W.2d 322, 327 (Minn.2001); *Wilson v. Comm'r of Revenue*, 619 N.W.2d 194, 198 (Minn.2000); *Dorso Trailer Sales, Inc. v. Am. Body & Trailer, Inc.*, 482 N.W.2d 771, 774 (Minn.1992).

The members of the England/Stencel group do not have that. The Debtor's liability to them was not reduced to final judgment in the Dakota County District Court before that court halted its proceedings in deference to the bankruptcy process. The England/Stencel group insists that it had all it needed to establish its right to judgment, from the deemed fact admissions that went to the elements of its causes of action against the Debtor. The problem is that in the application of *res judicata*, the second forum cannot sit in lieu of a first forum, to make the final adjudication that the first forum did not do, regardless of whether the first forum was poised to do so. If the first forum did not finish the job by formally entering final judgment before a matter was presented to a second forum, claim preclusion cannot lie in the second forum. The England/Stencel group has a fatal gap in its case for *res judicata*, and there is no way

---

**8.** That much being said, one must recognize an apparent conundrum in the remedy: how is an allowed unsecured *claim* (necessarily quantified in money) reduced to the same unit-measure as the referent equity interest ("common stock" or otherwise), so as to enable both to share from the estate or the implementation of a reorganization, on appropriate parity and, if appropriate, pro rata? *See* Georgakopoulos, 16 Bankr.Dev.J. at 99–

100. This issue is not ripe as yet, but may emerge at the confirmation hearing.

**9.** *E.g., Kaiser v. Northern States Power Co.*, 353 N.W.2d 899, 902 (Minn.1984) (res judicata/claim preclusion "bars a second suit for the same claim by the parties or their privies"; collateral estoppel/issue preclusion bars relitigation of issues of fact or law "in subsequent suits based on a different cause of action involving a party to the prior litigation").

to fill that absent this Court's grant of leave.[10]

■ "Equity," in its general sense, cannot lie in a bankruptcy case to override an explicit requirement of substantive non-bankruptcy law that governs the validity of a claim. *Raleigh v. Illinois Dept. of Rev.*, 530 U.S. at 15, 120 S.Ct. at 1951; *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228–229, 116 S.Ct. 2106, 2115, 135 L.Ed.2d 506 (1996); *United States v. Noland*, 517 U.S. 535, 543, 116 St.Ct. 1524, 1528, 134 L.Ed.2d 748 (1996). *See also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 198, 108 S.Ct. 963, 964, 99 L.Ed.2d 169 (1988); *In re Easton*, 882 F.2d 312, 314 (8th Cir.1989); *In re NWFX, Inc.*, 864 F.2d 593, 595 (8th Cir.1989); *Johnson v. First Nat'l Bank of Montevideo*, 719 F.2d 270, 273 (8th Cir. 1983) (all holding that Bankruptcy Court's general equity power under 11 U.S.C. § 105(a) cannot be used in fashion that would contravene other specific provisions of Bankruptcy Code or other governing substantive law). Thus, the England/Stencel group cannot raise the bar of preclusion to the Debtor's objection to its members' claims.

In short, the members of the England/Stencel group are situated no differently from those of the Houle/Peterson/Lofton group; despite the dispatch with which they pursued their remedies outside of bankruptcy, their claims nonetheless are subject to § 510(b) in this case.

## CONCLUSION

Framed as it was, the Debtor's objection to these claims must be overruled.

## ORDER

Under the memorandum of decision just made,

IT IS HEREBY DETERMINED AND ORDERED:

1. At present, the following parties hold allowed claims under color of the filed proofs of claim noted:

| CLAIMANT | CLAIM NUMBER |
| --- | --- |
| Steve and Charlene Houle | 76 |
| Jean Peterson | 77 |
| Chad Lofton | 78 |
| Jere and Suzanne Peterson | 79 |
| Charles and Roxanne England | 52 |
| Peter and Linda Stencel | 88 |

2. The Debtor's objections to the claims identified in Term 1 are overruled, and its requests that those claims be disallowed are denied. This disposition is without prejudice to the right of any party in interest to object to any of those claims on their merits, or on any other basis stated in 11 U.S.C. § 502(b).

3. The Debtor's request for an order declaring that the claims identified in Term 1 have "the same priority as common stock" in the Debtor is denied, because this issue is not ripe. This disposition is without prejudice to the right of the Debtor to provide for equivalent treatment for these claims in its plan of reorganization, and to the right of any claimant so

10. The England/Stencel group has one other problem, equally as troubling: its predicate fact admissions are probably unenforceable against the Debtor, as they were deemed under an order sought and obtained in technical violation of the automatic stay; hence, the act of deeming them was void, or at least voidable. *Compare In re Vierkant*, 240 B.R. 317 (8th Cir. BAP 1999) (holding that "an action taken in violation of the automatic stay is void *ab initio*," as specifically applied to post-petition entry of default judgment against debtors on motion presented pre-petition) with *In re Gibson*, 149 B.R. 562, 573 n. 7 (Bankr. D.Minn.1993) and *In re Victoria Grain Co. of Mpls.*, 45 B.R. 2 (Bankr.D.Minn.1984) (both holding that acts in violation of stay are voidable, but that Bankruptcy Court may decline to avoid the results of a technical violation in appropriate cases).

treated to object to the confirmation of that plan.