**U.S. CITIZENS ASSOCIATION, et al., Plaintiffs,**

**v.**

**Kathleen SEBELIUS, et al., Defendants.**

**Case No. 5:10 CV 1065.**

United States District Court, N.D. Ohio, Eastern Division.

Nov. 22, 2010.

Judgment Entry Feb. 28, 2011.

David E. Butz, William G. Williams, Krugliak, Wilkins, Griffiths & Dougherty,

Canton, OH, Christopher K. Niederhauser, Peter A. Arhangelsky, Emord & Associates, Mesa, AZ, David C. Grossack, Newton, MA, Jonathan W. Emord, Emord & Associates, Clifton, VA, for Plaintiffs.

Lynne Haddad Buck, Office of the U.S. Attorney, Cleveland, OH, Joel L. McElvain, Karen P. Seifert, Tamra T. Moore, United States Department of Justice, Washington, DC, Thomas W. Hardin, Hardin & Associates, New Philadelphia, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER

DAVID D. DOWD, JR., District Judge.

### I. Introduction

The plaintiffs, by their second amended complaint (Doc. 45), seek declaratory and injunctive relief with respect to the individual mandate to purchase health insurance beginning in the year 2014 as required by the recently adopted federal health care reform law as set forth in Patient Protection and Affordable Care Act, (hereinafter PPACA) Pub. L. No. 111–148, 124 Stat. 119 (2010), amended by Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, 124 Stat. 1029 (2010) (the "Act"). The plaintiffs allege the Act is unconstitutional with respect to the mandate to purchase health insurance by the year 2014 or suffer a penalty. Specifically, plaintiffs claim that the Act violates the Commerce Clause in Article I of the United States Constitution (Count 1), plaintiffs' freedom of expressive and intimate association guaranteed by the First and Fifth Amendments of the United States Constitution (Count 2), the due process clause of the Fifth Amendment of the United States Constitution (Count 3), and plaintiffs' constitutionally protected right to privacy (Count 4).

Plaintiffs request the following relief:

(1) Declare that the PPACA unconstitutionally exceeds Congress's authority under Article I, Section 8, because the Congress has no power to legislate that individuals purchase a particular product, here health insurance, with after-tax dollars:

(2) Declare that the PPACA violates Article I, Section 8, Clause 3 because it regulates those who do not have health insurance and do not wish to have health insurance despite the absence of activity on their part affecting interstate commerce in health insurance or health care;

(3) Declare that the PPACA is unconstitutional under the First Amendment because it unlawfully infringes on the Plaintiff's members' freedom not to associate with private health insurers "qualified" under the PPACA;

(4) Declare that the PPACA is unconstitutional under the First and Fifth Amendments because it infringes the Plaintiffs' right to intimate association with doctors of their choosing and compels an intimate association with insurers that provide coverage for medical methods and approaches Plaintiffs do not desire.

(5) Declare that the PPACA is unconstitutional under the Fifth Amendment because it deprives the Plaintiffs of their fundamental liberty right to refuse payment for private health insurance for unwanted medical services;

(6) Declare that the PPACA is unconstitutional because it violates the Plaintiffs' right to privacy protected by the Fifth Amendment liberty provision, the Ninth Amendment rights retained by the people, and the rights emanating from First, Third, Fourth, Fifth, and Ninth Amendments to the United States Constitution in that it compels disclosure of confidential medical information to private insurers;

(7) Enjoin the Defendants from enforcing the PPACA against USCA members;

(8) Award plaintiffs' counsel fees and costs as is deemed appropriate and just under the Equal Access to Justice Act;

(9) Retain jurisdiction of this action to ensure compliance with this Court's decree; and

(10) Grant such other and further relief as the Court deems equitable, just and proper.

The defendants have moved to dismiss all four counts of plaintiffs' second amended complaint. Doc. 47. Plaintiffs have opposed the motion (Doc. 50), and defendants have replied (Doc. 57). An amicus curiae brief has been filed on behalf of the Alliance for Natural Health—USA[1] in support of the plaintiffs' opposition to defendants' motion to dismiss. Doc. 54.

For the reasons contained herein, defendants' motion to dismiss is granted in part and denied in part.

## II. Similar Litigation in Other States Attacking the Mandate to Purchase Health Insurance by 2014

The Congressional enactment that citizens shall be required to buy health insurance or suffer a penalty has resulted in litigation across and the United States, and specifically, in United States District Courts in California, Florida, Virginia and Michigan. The results in other United States District Courts to date, in responding to motions to dismiss, have been mixed. In Florida, United States District Court Judge Roger Vinson denied a similar motion to dismiss, as did District Court Judge Henry Hudson of Virginia. To the contrary, United States District Court Judge Dana M. Sabraw in the Southern District of California granted a similar motion to dismiss, and denied plaintiffs' motion for a preliminary injunction.

In the Eastern District of Michigan, District Court Judge George Caram Steeh, with the agreement of the parties, consolidated the trial and preliminary injunction hearing on plaintiffs' Commerce Clause and tax power claims pursuant to Federal Rule of Civil Procedure 65(a)(2). Also in that case, the parties agreed that there were no factual disputes to be resolved and the matter could be decided as a matter of law. In an opinion issued after a hearing, Judge Steeh determined that the plaintiffs had standing, the case was ripe for the court's consideration, and that the court was not barred from hearing the case by the Anti–Injunction Act. Judge Steeh then went on to analyze the merits of plaintiffs' Commerce Clause and tax power claims, concluding that Congress had the power under the Commerce Clause to enact the PPACA and that the penalty imposed by Congress for failing to comply with the minimum coverage provision is incidental to that power. As a consequence, Judge Steeh denied plaintiffs' motion for a preliminary injunction and found for defendants on plaintiffs' first and second claims for relief, and dismissed those claims. *Thomas More Law Center, et al. v. Obama, et al.*, 720 F.Supp.2d 882 (E.D.Mich.2010). Judge Steeh subsequently entered a stipulated order dismissing plaintiffs remaining claims without prejudice, and plaintiffs have appealed to the United States Sixth Circuit Court of Appeals.

---

**1.** The Alliance contends that it was formed in 2002 and that it has a divided membership of 448 U.S. citizens and corporations with cognizable constitutional injuries resulting from the PPACA as its physician members provide integrative and alternative medical service not covered by health insurance and stand to experience a reduction in demand for services resulting from PPACA's individual mandate.

It is apparent to the undersigned that the controversy ignited by the passage of the legislation at issue in this case will eventually require a decision by the Supreme Court after the above-described litigation works its way through the various circuit courts. Against that background, this Court does not intend to write a lengthy opinion with respect to the defendants' motion to dismiss because the Court's decision will, in all likelihood, be without relevance by the time this case reaches the Supreme Court.

### III. Defendants' Motion to Dismiss for Lack of Standing and/or Ripeness

In granting the government's motion to dismiss, Judge Sabraw in the Southern District of California, determined that the plaintiffs' claims failed on standing grounds failing to find injury in fact. Continuing, Judge Sabraw opined that "Allegations of future injury will satisfy the requirement 'only if [the plaintiff] is *immediately* in danger of sustaining some *direct* injury as the result of the challenged official conduct'." After finding no injury in fact, Judge Sabraw granted the government's motion to dismiss.

■ Judge Vinson's opinion, filed on the 14th of October, 2010, reached different conclusions as to both standing and ripeness. Judge Vinson concluded that the 40–month delay before the mandate becomes effective in the year 2014, did not eliminate the issue of standing because of a certainty that the mandate will go into effect absent a judicial declaration or a change in the legislation by the Congress, and the fact of the certainty provided a sufficient basis to support standing.

■ As to the issue of ripeness, Judge Vinson declared:

There is a "conspicuous overlap" between the doctrines of standing and ripeness and the two "often converge[ ]." *See Elend v. Basham,* 471 F.3d 1199,

1205 (11th Cir.2006). Nevertheless, they warrant separate analyses.

"Ripeness is peculiarly a question of timing. Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreement." *Thomas v. Union Carbide Agr. Products Co.* 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (citations and alterations omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (citation omitted). The ripeness inquiry turns on " 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.' " *Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (citation omitted). In the context of a facial challenge, as in this case, "a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record." *Harris v. Mexican Speciality* [*Specialty* ] *Foods, Inc.,* 564 F.3d 1301, 1308 (11th Cir.2009). Because the individual mandate and employer mandate will not take effect until 2014, the defendants contend that those claims are unripe because no injury can occur before that time. However, "[w]here the inevitability of the operation of a statute against [plaintiffs] is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions come into effect." *Blanchette v. Connecticut Gen. Ins. Corps.,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). "The Supreme Court has long . . . held that where the enforcement of a statute is certain, a preenforcement

challenge will not be rejected on ripeness grounds." [*Florida State Conference of*] *NAACP* [*v. Browning*], *supra,* 522 F.3d [1153] at 1164 [ (11th Cir. 2008) ] (citing *Blanchette, supra,* 419 U.S. at 143 [95 S.Ct. 335] ).

The complained of injury in this case is "certainly impending" as there is no reason whatsoever to doubt that the federal government will enforce the individual mandate and employer mandate against the plaintiffs. Indeed, with respect to the individual mandate in particular, the defendants concede that it is absolutely necessary for the Act's insurance market reforms to work as intended. In fact, they refer to it as an "essential" part of the Act as least fourteen times in their motion to dismiss. It will clearly have to be enforced. *See Commonwealth of Pennsylvania v. State of West Virginia,* 262 U.S. 553, 592–93, 43 S.Ct. 658 [67 L.Ed. 1117], 262 U.S. 553 (1923) (suit filed shortly after the challenged statute passed into law and before it was enforced was not premature where the statute "certainly would operate as the complainant states apprehended it would"). The individual mandate will have to be imposed and enforced against the plaintiffs and others because if it is not, and with proscriptions against insurance companies denying coverage for pre-existing medical conditions, there would the potential for an enormous moral hazard.

The fact that the individual mandate and employer mandate do not go into effect until 2014 does not mean that they will not be felt in the immediate or very near future. To be sure, responsible individuals, businesses, and states will have to start making plans now or very shortly to comply with the Act's various mandates. Individuals who are presently insured will have to confirm that their current plans comply with the Act's requirements and, if not, take appropriate steps to comply; the uninsured will need to research available insurance plans, find one that meets their needs, and begin budgeting accordingly; and employers and states will need to revamp their healthcare programs to ensure full compliance. I note that at least two courts considering challenges to the individual mandate have thus far denied motions to dismiss on standing and ripeness grounds. *See Virginia* [*v. Sebelius*], *supra,* 702 F.Supp.2d [598] at 607–08 [ (E.D.Va.2010) ] (determining that because the individual mandate "radically changes the landscape of health insurance coverage in America," it will be felt by individuals, insurance carriers, employers, and states "in the near future"); *Thomas More Law Center v. Obama,* [720 F.Supp.2d 882, 889], 2010 WL 3952805, at *4 (E.D.Mich. Oct. 7, 2010) ("[T]he government is requiring plaintiffs to undertake an expenditure, for which the government must anticipate that significant financial planning will be required. That financial planning must take place well in advance of the actual purchase of insurance in 2014 ... There is nothing improbable about the contention that the Individual Mandate is causing plaintiffs to feel economic pressure today.")

The Supreme Court and the Eleventh Circuit, as noted, have not hesitated to consider pre-enforcement challenges to the constitutionality of legislation when the complained of injury is certainly impending and more than a hypothetical possibility. Because the issues in this case are fully framed, and the relevant facts are settled, "[n]othing would be gained by postponing a decision, and the public interest would be well served by a prompt resolution of constitutionality of the [the statute]." *See Thomas, supra,* 473 U.S. at 582 [105 S.Ct. 3325]. Therefore, the case is ripe for review.

After reviewing the opinions of Judge Sabraw and Judge Vinson, the Court finds the reasoning of Judge Vinson in keeping with this judge's view. Consequently, the motion of the defendants to dismiss based on standing and ripeness is denied.

IV. The Motion of the Defendants to Dismiss Based Upon the Argument that the Penalty for Failure to Buy Health Insurance Should Be Dismissed as Prohibited by the Anti–Injunction Act

 Once again, the Court is indebted to the thoughtful analysis of Judge Vinson with respect to whether the Anti–Injunction Act applies. His analysis begins at page seven of a 65–page opinion and continues through to the top of page thirty, and is attached hereto as Appendix I.

Once again, the Court agrees with the thoughtful and careful analysis of Judge Vinson and, as a consequence, denies the motion to dismiss based upon the defendants' reliance on the Anti–Injunction Act.

V. The Motion to Dismiss Based Upon the Proposition that the Mandatory Requirement to Purchase Health Insurance Does Not Violate the Commerce Clause

Count One of the plaintiffs' second amended complaint alleges in part as follows:

35. Congress may act to regulate only pursuant to its enumerated powers. *U.S. v. Wall,* 92 F.3d 1444, 1445–46 (6th Cir.1996) ("the power of Congress is by no means absolute: it may exercise only those powers enumerated in the Constitution"); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). The federal legislative power derives solely from the federal Constitution.

36. In PPACA Section 1501, Congress expressly relied on its authority under the Commerce Clause in Article I (Article I, Section 8, Clause 3): "The individual responsibility requirement provided for in this section ... is commercial and

economic in nature, and substantially affects interstate commerce, as a result of the effects described in paragraph (2)."

37. The United States Constitution Article I, Section 8, Clause 3 states that the United States Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." In *United States v. Lopez,* the Supreme Court held that Congress may regulate three categories of commerce: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) "those activities having a substantial relation to interstate commerce... i.e., those activities that substantially affect interstate commerce." *United States v. Lopez,* 514 U.S. 549, 558–59 [115 S.Ct. 1624, 131 L.Ed.2d 626] (1995) (interpreting federal statute that criminalized the possession of firearms within a school zone). Only the third category is implicated by Congress's mandatory insurance provision. United States citizens who do not possess and do not desire to possess health insurance, such as the Individual Plaintiffs and other members of Plaintiff USCA, do not engage in activities that substantially affect interstate commerce simply by residing in-state.

The defendants' motion to dismiss contends that the individual mandate requiring the purchase of health insurance as set forth in Section 1501 under the title of "Requirement to Maintain Minimum Essential Coverage" is a proper congressional exercise under the Commerce Clause. Secondly, the defendants contend that the passage of Section 1501 of the Act is a valid exercise of Congress's independent power under the general welfare clause. Defendants argue that Count 1 of plaintiffs' second amended complaint should be dismissed pursuant to 12(b)(6) of the Federal Rules of Civil Procedure for failure to

state a claim upon which relief can granted based on the recent teachings of the Supreme Court of the United States in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

■ At this stage of the proceedings, when considering the defendants' motion to dismiss, the issues before the Court regarding the commerce and the necessary and proper clauses constitute the primary issues before the Court with respect to the validity of the challenged Act. The Court finds that the allegations advanced by plaintiffs in Count One of the second amended complaint at this point pass the "plausibility" teachings of *Twombly* and *Iqbal, supra.*

It is the Court's view in this case that plaintiffs' Commerce Clause claim is not subject to a final resolution based on a motion to dismiss, but requires additional consideration by the Court in further proceedings. As a consequence, defendants' motion to dismiss Count 1 of plaintiffs' second amended complaint is DENIED

### VI. The Motion to Dismiss as it Relates to Counts Two, Three, Four of the Second Amended Complaint

■ Count Two of the second amended complaint alleges that the PPACA violates the plaintiffs' freedom of expressive and intimate association guaranteed by the First and Fifth Amendments. Count Three of the second amended complaint alleges that the PPACA violates the Fifth Amendment due process clause. Count Four alleges that the PPACA violates their constitutional right to privacy.

In support of their motion to dismiss Count 2 (Doc. 47–1), defendants argue that:

[a]bsent any plausible allegation that the statute has impaired plaintiffs' ability to express a message, this "mere association" does not violate the First Amendment .... because the [PP]ACA does not prohibit plaintiffs from joining together to advance their views on any subject, including the challenged provision....

After considering plaintiffs' second amended complaint in the context of *Twombly* and *Iqbal's* heightened "plausibility" pleading standard, the Court concludes that Count 2 of plaintiffs' second amended complaint fails to satisfy that standard, and therefore cannot survive defendants' 12(b)(6) motion to dismiss Count 2. The Court's review of Counts 3 and 4 under the *Twombly* and *Iqbal* analysis results in the same conclusion.

Accordingly, defendants' 12(b)(6) motion to dismiss Counts Two, Three and Four as set forth in the second amended complaint is GRANTED.[2]

### VII. Conclusion

For the reasons contained herein, defendants' motion to dismiss is denied in part and granted in part. Defendants' motion to dismiss Count One of the second amended complaint is DENIED. Defendants' motion to dismiss Counts Two, Three and Four of the second amended complaint is GRANTED.

If either the plaintiffs or the defendants are of the view that a period of discovery is necessary prior to the filing of dispositive motions, counsel should so indicate by December 3, 2010, and indicate how much time for discovery is needed.

If neither set of parties believe discovery is necessary, and upon such an indica-

---

**2.** As previously noted, the Court considers Count 1 to be the primary issue presented in this case. As a consequence, the Court will

not entertain a motion by the plaintiffs to amend their pleadings at this time.

tion by December 3, 2010, the Court will publish a schedule for dispositive motions.

IT IS SO ORDERED.

## APPENDIX I

## III. *DISCUSSION*

### A. Is the "Penalty" for Non-Compliance with the Individual Mandate Actually a "Tax" for Constitutional Analysis?

A fundamental issue overlaps the defendants' challenges to several of the plaintiffs' claims, and that is whether the individual mandate penalty is a "tax" within Congress's broad taxing power and thus subject to the Anti–Injunction Act, or instead, a "penalty" that must be authorized, if at all, by Congress's narrower Commerce Clause power. Because of the importance of this issue, I will analyze it first and at some length.

The defendants contend that the individual mandate penalty is a tax that is sustainable under Congress's expansive power to tax for the general welfare. U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the ... general Welfare"). The plaintiffs urge that, if it is a tax, it is an unconstitutional one. The defendants maintain that the plaintiffs have no standing to raise the claim at this point in time because of the Anti–Injunction Act.

The Anti–Injunction Act [26 U.S.C. § 7421(a)] provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person...." The remedy for challenging an improper tax is a post-collection suit for refund. As the Supreme Court has explained:

The Anti–Injunction Act ... could scarcely be more explicit—"no suit for the purpose of restraining the assessment or collection of any tax shall be

maintained in any court ..." The Court has interpreted the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, "and to require that the legal right to the disputed sums be determined in a suit for refund." The Court has also identified "a collateral objective of the Act—protection of the collector from litigation pending a suit for refund."

*Bob Jones Univ. v. Simon,* 416 U.S. 725, 736–37, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974) (citations omitted); *accord, e.g., United States v. Clintwood Elkhorn Min. Co.,* 553 U.S. 1, 10, 128 S.Ct. 1511, 170 L.Ed.2d 392 (2008) ("[The Anti–Injunction Act] commands that (absent certain exceptions) 'no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court,'" even if the tax is alleged to be unconstitutional, which means "the taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted"); *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) (explaining that the "manifest purpose" of the Anti–Injunction Act "is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund. In this manner the United States is assured of prompt collection of its lawful revenue."). The Anti–Injunction Act, in short, applies to "truly revenue-raising tax statutes," *see Bob Jones Univ., supra,* 416 U.S. at 743, 94 S.Ct. 2038, and seeks "protection of the revenues" pending a suit for refund. *See id.* at 737, 740, 94 S.Ct. 2038.

Because the individual mandate does not go into effect until 2014, which means the

penalty for non-compliance could not be assessed until that time, the Anti–Injunction Act, if it applies, could render much of this case premature and inappropriate as any injunctive or declaratory relief in favor of the plaintiffs could hinder collection of tax revenue. *See id.* at 732 n. 7, 738–39, 94 S.Ct. 2038 (where the outcome of a suit seeking injunctive or declaratory relief will prevent assessment and collection of tax revenue, the case "falls within the literal scope and the purposes of the [Anti–Injunction Act]"). Consequently, whether the individual mandate penalty is a tax is an important question that not only implicates jurisdiction (vis-a-vis the Anti–Injunction Act), and is not only the specific basis of one of the plaintiffs' causes of action, but it also goes to the merits of the individual mandate-related challenges of Counts One and Two (that is, whether the penalty can be justified by, and enforced through, Congress's indisputably broad taxing power), or whether, instead, the penalty must pass Constitutional muster, if at all, under the more limited Commerce Clause authority. As noted, I should, and will, consider this significant issue at the outset.[3]

### (1) Revenue-raising vs. regulatory

The plaintiffs contend that the individual mandate penalty is not a "true tax" because, among other things, it will (at most) "generate only 'some revenue,' and then only as an incident to some persons' failure to obey the law." *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl. Mem."), at 19 (doc. 68). In other words, because its primary purpose is regulatory—and will only raise "little" revenue—it is not a tax as the term is generally understood. It is true, as held in certain of the early tax cases to which the plaintiffs cite, *see, e.g., Lipke v. Lederer,* 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061 (1922); *Hill v. Wallace,* 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922), that the Supreme Court once drew distinctions between regulatory and revenue-raising taxes. However, those holdings had a very short shelf-life. As noted in *Bob Jones Univ., supra,* which cited to *Lipke* and *Hill* for that position, "the Court ... subsequently abandoned such distinctions." 416 U.S. at 741 n. 12, 94 S.Ct. 2038; *see also id.* at 743, 94 S.Ct. 2038 (further stating that the cases were "of narrow scope" and "produced a prompt correction in course"). Succeeding case law recog-

---

**3.** The plaintiffs have briefly suggested that the Anti–Injunction does not apply to this case because their challenge "is to the individual mandate itself" and not the "incidental penalty that accompanies the individual mandate." While it is true that the language of the Anti–Injunction Act only prohibits suits "for the purpose of restraining the assessment or collection of any tax," which would not apply to the individual mandate for every citizen to maintain healthcare coverage, the mandate and penalty clearly work in tandem. If the penalty is a legitimate tax, striking the individual mandate down will necessarily impede assessment and collection of tax revenue. The Anti–Injunction Act is not limited to direct and actual tax assessment or collection; the Eleventh Circuit and other courts have held that the statute also reaches activities that may "eventually" impede the collection of revenue (even if indirectly). *See, e.g., Gulden v. United States,* 287 Fed.Appx. 813, 815–17 (11th Cir.2008) (explaining that the Anti–Injunction Act is "interpreted broadly" and "bars not only suits that directly seek to restrain the assessment or collection of taxes, but also suits that seek to restrain ... activities 'which are intended to or may culminate in the assessment or collection of taxes' ") (citation omitted); *Judicial Watch Inc. v. Rossotti,* 317 F.3d 401, 405 (4th Cir.2003) ("it is clear that the Anti–Injunction Act extends beyond the mere assessment and collection of taxes to embrace other activities," such as those that may eventually "culminate in the assessment or collection of taxes").

nized that "[e]very tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. But a tax is not any the less a tax because it has a regulatory effect." *Sonzinsky v. United States*, 300 U.S. 506, 513, 57 S.Ct. 554, 81 L.Ed. 772 (1937); *see also id.* ("it has long been established that an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax ... tends to restrict or suppress the thing taxed"). Thus, as the law currently exists, "[i]t is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed. The principle applies even though the revenue obtained is obviously negligible, or the revenue purpose of the tax may be secondary." *United States v. Sanchez*, 340 U.S. 42, 44, 71 S.Ct. 108, 95 L.Ed. 47 (1950); *accord United States v. Kahriger*, 345 U.S. 22, 27 n. 3, 28, 73 S.Ct. 510, 97 L.Ed. 754 (1953) (holding same and sustaining federal gambling tax even though its proponents sought to hinder the activity at issue and " 'indulge[d] the hope that the imposition of this type of tax would eliminate that kind of activity' "), overruled on other grounds, *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). The elimination of the "regulatory vs. revenue-raising" test does not necessarily mean, however, that the exaction at issue in this case is a "tax."

### (2) The Court's role in ascertaining what Congress intended

In deciding this specific question, I will start from the assumption (only for the analysis of whether it is a tax) that Congress could have used its broad taxing power to impose the exaction and that, if it

had clearly (or even arguably) intended to do so, then the exaction would have been sustainable under its taxing authority. *See Kahriger, supra,* 345 U.S. at 28, 31, 73 S.Ct. 510 ("As is well known, the constitutional restraints on taxing are few," and courts are generally "without authority to limit the exercise of the taxing power"); *see also United States v. Ptasynski,* 462 U.S. 74, 103 S.Ct. 2239, 76 L.Ed.2d 427 (1983) (observing that "Congress's power to tax is virtually without limitation").[4] However, that is not what happened here. Although factually dissimilar, on this point I find instructive the early case of *Helwig v. United States,* 188 U.S. 605, 23 S.Ct. 427, 47 L.Ed. 614 (1903). At issue in that case was a federal law that required importers to pay a duty on imported items based on their declared value, plus "a further sum" for any item subsequently found to have been inadequately valued. The sole question the Supreme Court was called upon to decide was whether, for jurisdictional purposes, the so-called "further sum" was "revenue from imports or tonnage" (i.e., a tax), or whether it was in the nature of a penalty. The Court stated:

> Although the statute, under § 7, *supra,* terms the money demanded as 'a further sum,' and does not describe it as a penalty, still the use of those words does not change the nature and character of the enactment. *Congress may enact that such a provision shall not be considered as a penalty or in the nature of one, ... and it is the duty of the court to be governed by such statutory direction,* but the intrinsic nature of the provision remains, and, *in the absence of any declaration by Congress affecting the manner in which the provision shall be treated,* courts must decide the matter in accordance with their views of the nature of the act.

---

**4.** *But see* the discussion with respect to Count Three, Part III.C(4) *infra.*

*Id.* at 612–13, 23 S.Ct. 427 (emphasis added). In concluding that the provision was a penalty, the Court stated that, based on the statutory language and its application to the facts of the case, it was "impossible . . . to hold this provision to be other than penal in its nature." *Id.* at 613, 23 S.Ct. 427. To be clear, it is *not* necessarily significant for our purposes that *Helwig* found the "further sum" to be in the nature of a penalty and not a tax; rather, what is significant is what the Supreme Court said along the way to getting there. In reaching its conclusion, the Court made it a point to stress—as it did in the emphasized portion quoted above—that regardless of the "ordinary or general meaning of the words" in the statute, and regardless of the "nature and character of the enactment," the exaction would *not* have been found a penalty if Congress intended otherwise. Thus, "[i]f it clearly appear that it is the will of Congress that the provision shall *not* be regarded as in the nature of a penalty, *the court must be governed by that will*." *Id.* (emphasis added).

As applied to the facts of this case, *Helwig* can be interpreted as concluding that, regardless of whether the exaction could otherwise qualify as a tax (based on the dictionary definition or "ordinary or general meaning of the word"), it cannot be regarded as one if it "clearly appears" that Congress did not intend it to be. In this case, there are several reasons (perhaps none dispositive alone, but convincing in total) why it is inarguably clear that Congress did not intend for the exaction to be regarded as a tax.[5]

### (3) Congress did not call it a tax, despite knowing how to do so

In addition to the Act, there were several healthcare reform bills introduced and debated during the 111th Congress. For example, "America's Affordable Health Choices Act of 2009" (H.R. 3200) was introduced in the House of Representatives on July 14, 2009. Like the Act, it contained an individual mandate and concomitant penalty. However, it called the penalty a tax. Section 401 was unambiguously titled "Tax on Individuals Without Acceptable Health Care Coverage," and went on to refer to the exaction as a "tax" no less than fourteen times in that section alone. *See, e.g., id.* (providing that with respect to "any individual who does not meet the requirements of subsection (d) at any time during the taxable year, there is hereby imposed a tax"). H.R. 3200 was thereafter superseded by a similar bill, "Affordable Health Care for America Act" (H.R. 3962), which was actually passed in the House of Representatives on November 7, 2009. That second House bill also included an individual mandate and penalty, and it repeatedly referred to the penalty as a "tax." *See, e.g.,* Section 501 (providing that for any person who does not comply with the individual mandate "there is hereby imposed a tax," and referring to that "tax" multiple times); Section 307(c)(1)(A) (further referring to the penalty as a "tax [ ] on individuals not obtaining acceptable coverage").

---

**5.** Although it only matters what Congress intended, I note for background purposes that before the Act was passed into law, one of its chief proponents, President Barack Obama, strongly and emphatically denied that the penalty was a tax. When confronted with the dictionary definition of a "tax" during a much-publicized interview widely disseminated by all of the news media, and asked how the penalty did not meet that definition, the President said it was "absolutely not a tax" and, in fact, "[n]obody considers [it] a tax increase." *See, e.g., Obama: Requiring Health Insurance is Not a Tax Increase,* CNN, Sept. 29, 2009, available at: http://www.cnn.com/2009/POLITICS/09/20/obama.health.care/index.html.

While the above bills were being considered in the House, the Senate was working on its healthcare reform bills as well. On October 13, 2009, the Senate Finance Committee passed a bill, "America's Healthy Future Act" (S. 1796). A precursor to the Act, this bill contained an individual mandate and accompanying penalty. In the section titled "Excise Tax on Individuals Without Essential Health Benefits Coverage," the penalty was called a "tax." *See* Section 1301 ("If an applicable individual fails to [obtain required insurance] there is hereby imposed a tax").

In contrast to the foregoing, the Act—which was the final version of the healthcare legislation later passed by the Senate on December 24, 2009—did *not* call the failure to comply with the individual mandate a tax; it was instead called a "penalty." The Act reads in pertinent part: "If an applicable individual fails to meet the requirement of subsection (a) ... there is hereby imposed a penalty." Act § 1501(b)(1). Congress's conspicuous decision to not use the term "tax" in the Act when referring to the exaction (as it had done in at least three earlier incarnations of the legislation) is significant. " 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.' " *INS v. Cardoza–Fonseca*, 480 U.S. 421, 442, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Thus, "[w]here Congress includes [certain] language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the [omitted text] was not intended." *Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *see also United States v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir.1991) (changes in statutory language "generally indicate [ ] an intent to change the mean-

ing of the statute"); *Southern Pac. Transportation Co. v. Usery*, 539 F.2d 386, 390–91 (5th Cir.1976) (rejecting the interpretation of a statute that was based on language in an earlier House version that the Senate changed prior to passing into law, and attaching "weight to the [Senate's] conscious and deliberate substitution of [the House's] language") (binding under *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc* )).

Congress's failure to call the penalty a "tax" is especially significant in light of the fact that the Act itself imposes a number of taxes in several other sections (*see, e.g.,* Excise Tax on Medical Device Manufacturers, § 1405 ("There is hereby imposed on the sale of any taxable medical device by the manufacturer, producer, or importer a tax"); Excise Tax on High Cost Employer–Sponsored Health Coverage, § 9001 ("there is hereby imposed a tax"); Additional Hospital Insurance Tax on High-Income Taxpayers, § 9015 ("there is hereby imposed a tax"); Excise Tax on indoor Tanning Services, § 10907 ("There is hereby imposed on any indoor tanning service a tax")). This shows beyond question that Congress knew how to impose a tax when it meant to do so. Therefore, the strong inference and presumption must be that Congress did not intend for the "penalty" to be a tax. *See generally Hodge v. Muscatine County*, 196 U.S. 276, 25 S.Ct. 237, 49 L.Ed. 477 (1905) (noting that "[i]t is not easy to draw an exact line of demarcation between a tax and a penalty," but where the statute uses "tax" in one section and "penalty" in another, courts "cannot go far afield" in treating the exaction as it is called; to do otherwise "would be a distortion of the words employed"); *see also Duncan v. Walker*, 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("It is well settled that '[w]here Congress includes particular language in one section of

a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citations omitted); *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians,* 563 F.3d 1205, 1209 (11th Cir. 2009) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling"); *DIRECTV, Inc. v. Brown,* 371 F.3d 814, 818 (11th Cir.2004) ("[W]hen Congress uses different language in similar sections, it intends different meanings.").

The defendants assert in their memorandum, *see* Memorandum in Support of Defendants' Motion to Dismiss ("Def. Mem."), at 33, 50 n. 23 (doc. 56–1), as they did during oral argument, that in deciding whether the exaction is a penalty or tax, "it doesn't matter" what Congress called it because the label "is not conclusive." *See* Transcript of Oral Argument ("Tr."), at 27–29 (doc. 77). As a general rule, it is true that the label used is not controlling or dispositive because Congress, at times, may be unclear and use inartful or ambiguous language. Therefore, as the Supreme Court recognized more than 100 years ago in *Helwig, supra,* the use of a particular word "does not change the nature and character of the [exaction]," and it is the ultimate duty of the court to decide the issue based on "the intrinsic nature of the provision" irrespective of what it is called. *See* 188 U.S. at 612–13, 23 S.Ct. 427; *accord Cooley v. Bd. of Wardens,* 53 U.S. (12 How.) 299, 314, 13 L.Ed. 996 (1851) ("it is the thing, and not the

name, which is to be considered"). However, as also noted in *Helwig,* this rule must be set aside when it is clear and manifest that Congress intended the exaction to be regarded as one and not the other. For that reason, the defendants are wrong to contend that what Congress called it "doesn't matter." To the extent that the label used is not just a label, but is actually indicative of legislative purpose and intent, it very much does matter. By deliberately changing the characterization of the exaction from a "tax" to a "penalty," but at the same time including many other "taxes" in the Act, it is manifestly clear that Congress intended it to be a penalty and not a tax.[6]

Quoting the Third Circuit in *Penn Mut. Indem. Co. v. C.I.R,* 277 F.2d 16, 20 (3d Cir.1960), the defendants maintain that "'Congress has the power to impose taxes generally, and if the particular imposition does not run afoul of any constitutional restrictions then the tax is lawful, call it what you will.'" Def. Mem. at 50 n. 23. I do not necessarily disagree with this position, at least not when it is quite clear that Congress intends to impose a tax and is acting pursuant to its taxing power. However, as will be discussed in the next section, that is not the situation here. In the *Penn Mutual Indemnity* case, for example, it was clear and undisputed that Congress had exercised its taxing authority to impose the exaction; it was inarguably a "tax," and the only question was whether it was an excise tax, an income tax, or some other type of tax. It was in that particular context that the Third Circuit's analysis

---

**6.** A hypothetical helps to further illustrate this point. Suppose that after the Act imposed the penalty it went on to expressly state: "This penalty is not a tax." According to the logic of the defendants' argument, if the intrinsic nature of the penalty was a tax, it could still be regarded as one despite what it was called and despite the clear and unmistakable Congressional intent to the contrary. Such an outcome would be absurd. In my view, changing the word from tax to penalty, but at the same time including various other true (and accurately characterized) taxes in the Act, is the equivalent of Congress saying "This penalty is not a tax."

included the quoted statement, and further elaborated that: "It is not necessary to uphold the validity of the tax imposed by the United States that the tax itself bear an accurate label." *See* 277 F.2d at 20. That is obviously a very different situation from the one presented here, where the precise *label* of an acknowledged tax is not being disputed, but rather whether it is even a tax *at all.*

### (4) Congress did not state that it was acting under its taxing authority, and, in fact, it treated the penalty differently than traditional taxes

Congress did not state in the Act that it was exercising its taxing authority to impose the individual mandate and penalty; instead, it relied exclusively on its power under the Commerce Clause. U.S. Const. art. I, § 8, cl. 3 ("[Congress shall have Power] To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"). The Act recites numerous (and detailed) factual findings to show that the individual mandate regulates commercial activity important to the economy. Specifically, it states that: "The [individual mandate] is commercial and economic in nature, and substantially affects interstate commerce" in that, *inter alia,* "[h]ealth insurance and health care services are a significant part of the national economy" and the mandate "will add millions of new consumers to the

health insurance market, increasing the supply of, and demand for, health care services." Act § 1501(a)(1)-(2)(B)(C). It further states that health insurance "is in interstate commerce," and the individual mandate is "essential to creating effective health insurance markets." *Id.* § 1501(a)(2)(F), (H). The Act contains *no* indication that Congress was exercising its taxing authority or that it meant for the penalty to be regarded as a tax. Although the penalty is to be placed in the Internal Revenue Code under the heading "Miscellaneous Excise Taxes," the plain language of the Code itself states that this does not give rise to any inference or presumption that it was intended to be a tax. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 222–23, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (citing to 26 U.S.C. § 7806(b), which provides that: "No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision or portion of this title"). In fact, while the penalty is placed under the "Excise Taxes" heading of the Code, at the same time Congress specifically exempted and divorced the penalty from all the traditional enforcement and collection methods used by the Internal Revenue Service, such as tax liens, levies, and criminal proceedings. *See* Act § 1501(b). These exemptions from normal tax attributes—coupled with Congress's failure to identify its taxing authority—belie the claim that, simply because it is mentioned in the Internal Revenue Code, the penalty must be a tax.[7]

---

7. In highlighting that Congress did not identify its taxing power as the basis for imposing the "penalty," I am not suggesting that legislative action is invalid if a power source is not identified. To the contrary, I recognize that "Congress's failure to cite [a particular power] does not eliminate the possibility that [said power] can sustain this legislation." *United States v. Moghadam,* 175 F.3d 1269, 1275 n. 10 (11th Cir.1999); *see also Wilson–Jones v. Caviness,* 99 F.3d 203, 208 (6th Cir.1996) ("A source of power [can] justify an act of Con-

gress even if Congress did not state that it rested the act on the particular source of power.") (citing cases, including *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.")). Thus, to be clear, I am not saying that the penalty is invalid as a tax because Congress did not expressly identify its taxing power. Rather, its failure to do so (particularly when it took

### (5) *Lack of statutorily-identified revenue-generating purpose*

Perhaps most significantly, the Act does not mention any revenue-generating purpose that is to be served by the individual mandate penalty, even though such a purpose is required. *See Rosenberger v. Rector and Visitors of Univ. of Virginia,* 515 U.S. 819, 841, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (" 'A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government' "). In this circuit, the ultimate test of tax validity "is whether *on its face* the tax operates as a revenue generating measure and the attendant regulations are in aid of a revenue purpose." *United States v. Ross,* 458 F.2d 1144, 1145 (5th Cir.1972) (emphasis added) (binding under *Bonner, supra,* 661 F.2d at 1207).

The revenue-generating provisions in the Act were an important part of the legislation as they were necessary under current Congressional procedure to score its final cost. To be sure, much of the debate within and outside Congress focused on the bill's final price tag and whether it would exceed the threshold of $1 trillion over the course of the first ten years; and while the legislation was being debated, Congress worked closely and often with the Congressional Budget Office ("CBO") to ensure that it did not. Obviously, if the penalty had been intended by Congress to be a true revenue-generating tax (that could be used to keep the Act's final cost down) then it would have been treated as a tax "on its face." During oral argument, defense counsel stated that "[t]he purpose of the [penalty] is … to raise revenue to offset expenditures of the federal government that it makes in con-

nection, for example, with the Medicaid expansion." *See* Tr. at 9. However, there is absolutely no support for that statement in the statute itself.

On its face, the Act lists seventeen "Revenue Offset Provisions" (including the several taxes described *supra* ), and, as reconciled, it further includes a section entitled "Provisions Relating to Revenue" (which also references those taxes and other revenue offsetting provisions). However, the individual mandate penalty is not listed anywhere among them. Nowhere in the statute is the penalty provision identified or even mentioned as raising revenue and offsetting the Act's costs. It is especially noteworthy that the Act does not identify revenue to be generated from the penalty (which the defendants now maintain would raise about *$4 billion* each year), but the statute identifies the tanning salon tax as revenue-raising (even though that tax is expected to raise a significantly smaller *$300 million* annually). *See* Joint Committee on Taxation, Estimated Revenue Effects of the Manager's Amendment to the Revenue Provisions Contained in the "Patient Protection and Affordable Care Act," as Passed by the Senate on December 24, 2009 (JCX–10–10), March 11, 2010, at 2. If Congress had intended and understood the penalty to be a tax that would raise revenue for the government, which could in turn be used to partially finance the Act's budgetary effect and help keep its ten-year cost below the $1 trillion threshold by offsetting its expenditures, it makes little sense that Congress would ignore a "tax" that could be expected to raise almost § 20 billion in revenue between the years 2015–2019, yet mention another tax that was expected to raise less

time to extensively identify its Commerce Clause power), is merely one of several facts that shows Congress was not exercising its

taxing authority and did not intend for the penalty to be regarded as a tax.

than one-tenth of that revenue annually during the same time period.

To the extent there is statutory ambiguity on this issue, both sides ask that I look to the Act's legislative history to determine if Congress intended the penalty to be a tax. Ironically, they rely on the same piece of legislative history in making their respective arguments, to wit, the 157–page "Technical Explanation" of the Act that was prepared by the Staff of the Joint Committee on Taxation on March 21, 2010 (the same day the House voted to approve and accept the Senate bill and two days before the bill was signed into law). The plaintiffs highlight the fact that the report "consistently" refers to the penalty as a penalty and *not* a tax, *see* Pl. Mem. at 19 (as compared, for example, with the tanning salon tax that is consistently referred to as a "tax" in that same report, *see* JCT, Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act" (JCX–18–10), March 21, 2010, at 108). The defendants, on the other hand, highlight the fact that the JCT referred to the penalty as an "excise tax" in a single heading in that report. *See* Def. Mem. at 51.

As the Supreme Court has repeatedly held, "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation *only* to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise *ambiguous* terms." *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (emphasis added). On the facts of this case, "penalty" is not an ambiguous term, but rather was a carefully and intentionally selected word that has a specific meaning and carries a particular import (discussed *infra* ).

Moreover, even if the term was ambiguous, the Supreme Court has pointed out two "serious criticisms" of attempting to rely on legislative history:

Not all extrinsic materials are reliable sources of insight into legislative understandings ..., and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in " 'looking over a crowd and picking out your friends.' " *See* Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 214 (1983). Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text. *Id.*

In this case, both criticisms are directly on the mark. The report is ambiguous and contradictory, as evidenced by the simple fact that both sides claim it supports their position. Should I look to the heading (that calls the exaction an "excise tax"), or should I look to the actual body of the report (that calls it a penalty no less than twenty times with no mention of it being a tax)? It is, as Judge Leventhal said, like "looking over a crowd and picking out your friends." Further, a strong argument could be (and has been) made that the staffers who drafted the report were merely engaging in last minute "strategic manipulation" to secure results they

were unable to achieve through the Act itself. *See, e.g., The Insurance Mandate in Peril,* Wall St. J., Apr. 29, 2010, at A19 (opining that the "excise tax" heading in the JCT report should not be used to convert the penalty into a tax because the Supreme Court "will not allow staffers and lawyers to change the statutory cards that Congress already dealt when it adopted the Senate language"). For these reasons, as recognized by the Supreme Court, resort to, or reliance upon, the JCT staff's Technical Explanation would be inappropriate on the facts of this case—even if the term "penalty" was ambiguous (which it is not).

To summarize the foregoing, it "clearly appears" from the statute itself, *see Helwig, supra,* 188 U.S. at 613, 23 S.Ct. 427, that Congress did not intend to impose a tax when it imposed the penalty. To hold otherwise would require me to look beyond the plain words of the statute. I would have to ignore that Congress:

(i) specifically changed the term in previous incarnations of the statute from "tax" to "penalty;"

(ii) used the term "tax" in describing the several other exactions provided for in the Act;

(iii) specifically relied on and identified its Commerce Clause power and not its taxing power;

(iv) eliminated traditional IRS enforcement methods for the failure to pay the "tax;" and

(v) failed to identify in the legislation any revenue that would be raised from it, notwithstanding that at least seventeen other revenue-generating provisions were specifically so identified.

The defendants have not pointed to any reported case decided by any court of record that has ever found and sustained a tax in a situation such as the one presented here, and my independent research has also revealed none. At bottom, the defendants are asking that I divine hidden and unstated intentions, and despite considerable evidence to the contrary, conclude that Congress really meant to say one thing when it expressly said something else. The Supreme Court confronted the inverse of this situation in *Sonzinsky, supra,* and I believe the rationale of that case forecloses the defendants' argument.

The issue in *Sonzinsky* was whether a levy on the sale of firearms was a tax. The exaction was called a tax on its face, and it was undisputed that it had been passed pursuant to Congress's taxing power. Nonetheless, the petitioner sought to invalidate the tax because it was "prohibitive in effect and [disclosed] unmistakably the legislative purpose to regulate rather than to tax." The petitioner argued that it was not "a true tax, but a penalty." In rejecting this argument, the Supreme Court explained:

> Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts. They will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power.

Stated somewhat differently, reviewing courts cannot look beyond a statute and inquire as to whether Congress meant something different than what it said. If an exaction says "tax" on its face and was imposed pursuant to Congress's taxing power, courts "are not free to speculate as to the motives which moved Congress to impose it, or as to the extent to which it may [be a penalty intended] to restrict the activities taxed." *See generally Sonzinsky, supra,* 300 U.S. at 511–14, 57 S.Ct. 554; *accord Kahriger, supra,* 345 U.S. at 22, 73 S.Ct. 510 (similarly declining invita-

tion to hold that "under the pretense of exercising" a particular power, Congress was, in fact, exercising another power).

The holding of *Sonzinsky* cuts both ways, and applying that holding to the facts here, I have no choice but to find that the penalty is not a tax. Because it is called a penalty on its face (and because Congress knew how to say "tax" when it intended to, and for all the other reasons noted), it would be improper to inquire as to whether Congress really meant to impose a tax. I will not assume that Congress had an unstated design to act pursuant to its taxing authority, nor will I impute a revenue-generating purpose to the penalty when Congress specifically chose not to provide one. It is "beyond the competency" of this court to question and ascertain whether Congress really meant to do and say something other than what it did. As the Supreme Court held by necessary implication, this court cannot "undertake, by collateral inquiry as to the measure of the [revenue-raising] effect of a [penalty], to ascribe to Congress an attempt, under the guise of [the Commerce Clause], to exercise another power." *See Sonzinsky, supra,* 300 U.S. at 514, 57 S.Ct. 554. This conclusion is further justified in this case since President Obama, who signed the bill into law, has "absolutely" rejected the argument that the penalty is a tax. *See supra* note 5.

To conclude, as I do, that Congress imposed a penalty and not a tax is not merely formalistic hair-splitting. There are clear, important, and well-established differences between the two. *See Dep't of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 779–80, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) ("Whereas [penalties] are readily characterized as sanctions, taxes are typically different because they are usually motivated by revenue-raising, rather than

punitive, purposes."); *Reorganized CF & I Fabricators of Utah, Inc., supra,* 518 U.S. at 224, 116 S.Ct. 2106 (" 'a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government,' " whereas, "if the concept of penalty means anything, it means punishment for an unlawful act or omission"); *United States v. La Franca,* 282 U.S. 568, 572, 51 S.Ct. 278, 75 L.Ed. 551 (1931) ("A 'tax' is an enforced contribution to provide for the support of government; a 'penalty,' as the word is here used, is an exaction imposed by statute as punishment for an unlawful act.' "). Thus, as the Supreme Court has said, "[t]he two words are not interchangeable one for the other . . .; and if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such." *La Franca, supra,* 282 U.S. at 572, 51 S.Ct. 278.

### (6) Does the Anti–Injunction Act apply anyway?

The defendants insist that the Anti–Injunction Act should still preclude the individual mandate challenges even if the penalty is not a tax. For this argument, the defendants rely on Title 26, United States Code, Section 6671, which states that the "penalties" provided under subchapter B of chapter 68 of the IRS Code (a classification that includes the individual mandate penalty) "shall be assessed and collected in the same manner as taxes." If the penalty is intended to be assessed and collected in the same manner as a tax, the defendants contend, then the Anti–Injunction Act should apply. I do not agree. First of all, the penalty is obviously *not* to be collected and treated "in the same manner as taxes" in light of the fact that Congress specifically divorced the penalty from the tax code's traditional collection and enforcement mechanisms. Further, and more significantly, as noted *supra,* the whole point of the Anti–Injunction Act is to protect the

government in the collection of its lawful tax revenues, and thus it applies to "truly revenue-raising tax statutes," which Congress plainly did not understand and intend the penalty to be. The Eleventh Circuit has recognized (albeit by implication) that the Anti–Injunction Act does not reach penalties that are, as here, "imposed for substantive violations of laws not directly related to the tax code" and which are not good-faith efforts to enforce the technical requirements of the tax law. *Cf. Mobile Republican Assembly v. United States,* 353 F.3d 1357, 1362 n. 5 (11th Cir.2003). The defendants have cited two out-of-circuit cases in support of their contention that Section 6671(a) requires penalties to be treated the same as taxes for Anti–Injunction Act purposes, *Barr v. United States,* 736 F.2d 1134 (7th Cir. 1984); *Warren v. United States,* 874 F.2d 280 (5th Cir.1989). Although those cases did indeed hold that the penalties at issue fell under the Anti–Injunction Act, they do not really support the defendants' position. As the plaintiffs note, the penalties in both those cases were imposed for failing to pay an undisputed *tax,* that is, falsely claiming an exemption in *Barr,* and refusing to sign a tax return in *Warren.* In other words, the penalties were "directly related to the tax code." *Cf. Mobile Republican Assembly, supra,* 353 F.3d at 1362 n. 5. Allowing IRS penalties such as those to qualify as a tax for Anti–Injunction Act purposes "is simply a means for ensuring that the [underlying] tax is paid." *See Botta v. Scanlon,* 314 F.2d 392, 393 (2d Cir.1963). That is not the situation here. It would be inappropriate to give tax treatment under the Anti–Injunction Act to a civil penalty that, by its own terms, is not a tax; is not to be enforced as a tax; and does not bear any meaningful relationship to the revenue-generating purpose of the tax code. Merely placing a penalty (which virtually all federal statutes have) in the IRS Code, even though it otherwise bears no meaningful relationship thereto, is not enough to render the Anti–Injunction Act (which only applies to true revenue-raising exactions) applicable to this case.

### (7) Accountability

I will say one final thing on the tax issue, which, although I believe it to be important, is not essential to my decision. For purposes of this discussion, I will assume that the defendants are correct and that the penalty is (and was always intended to be) a tax.

In *Virginia v. Sebelius,* 3:10cv188, one of the twenty or so other lawsuits challenging the Act, the federal government's lead counsel (who is lead defense counsel in this litigation, as well) urged during oral argument in that case that the penalty is proper and sustainable under the taxing power. Although that power is broad and does not easily lend itself to judicial review, counsel stated, "there is a check. It's called Congress. *And taxes are scrutinized.* And the reason we don't have all sorts of crazy taxes is because taxes are among the *most scrutinized* things we have. *And the elected representatives in Congress are held accountable for taxes that they impose." See* Transcript of Oral Argument (Virginia case), at 45 (emphasis added).

This foregoing statement highlights one of the more troubling aspects of the defendants' "newfound"[8] tax argument. As

---

8. *See, e.g., Changing Stance, Administration Now Defends Insurance Mandate as a Tax,* N.Y. Times, July 17, 2010, at A14 ("When Congress required most Americans to obtain health insurance or pay a penalty, Democrats denied that they were creating a new tax. But in court, the Obama administration and its allies now defend the requirement as an exercise of the government's 'power to lay and collect taxes.' ").

noted at the outset of this order, and as anyone who paid attention to the health-care reform debate already knew, the Act was very controversial at the time of passage. Irrespective of the merits of the arguments for or against it, the legislation required lawmakers in favor of the bill to cast politically difficult and tough votes. As it turned out, the voting was extremely close. Because by far the most publicized and controversial part of the Act was the individual mandate and penalty, it would no doubt have been even more difficult to pass the penalty as a tax. Not only are taxes always unpopular, but to do so at that time would have arguably violated pledges by politicians (including the President) to not raise taxes, which could have made it that much more difficult to secure the necessary votes for passage. One could reasonably infer that Congress proceeded as it did specifically *because* it did not want the penalty to be "scrutinized" as a $4 billion annual tax increase, and it did not want at that time to be "held accountable for taxes that they imposed." In other words, to the extent that the defendants are correct and the penalty was intended to be a tax, it seems likely that the members of Congress merely called it a penalty and did not describe it as revenue-generating to try and insulate themselves from the potential electoral ramifications of their votes.

Regardless of whether the members of Congress had this specific motivation and intent (which, once again, is not my place to say), it is obvious that Congress did not pass the penalty, in the version of the legislation that is now "the Act," as a tax under its taxing authority, but rather as a penalty pursuant to its Commerce Clause power. Those two exactions, as previously noted, are not interchangeable. And, now that it has passed into law on that basis, government attorneys have come into this court and argued that it was a tax after all. This rather significant shift in position, if permitted, could have the consequence of allowing Congress to avoid the very same accountability that was identified by the government's counsel in the Virginia case as a check on Congress's broad taxing power in the first place. in other words, the members of Congress would have reaped a *political advantage* by calling and treating it as a penalty while the Act was being debated, *see Virginia v. Sebelius,* 702 F.Supp.2d 598, 612 (E.D.Va.2010) (referring to "preenactment representations by the Executive and Legislative branches" that the penalty was *not* "a product of the government's power to tax for the general welfare"), and then reap a *legal advantage* by calling it a tax in court once it passed into law. *See* Def. Mem. at 33–34, 49 (arguing that the Anti–Injunction Act bars any challenge to the penalty which, in any event, falls under Congress's "very extensive" authority to tax for the general welfare). This should not be allowed, and I am not aware of any reported case where it ever has been.

Congress should not be permitted to secure and cast politically difficult votes on controversial legislation by deliberately calling something one thing, after which the defenders of that legislation take an "Alice–in–Wonderland" tack [9] and argue in court that Congress really meant something else entirely, thereby circumventing the safeguard that exists to keep their

---

9. Lewis, Carroll, *Through the Looking–Glass,* Chapter 6 (Heritage 1969):

"When I use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more or less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

broad power in check. If Congress intended for the penalty to be a tax, it should go back and make that intent clear (for example, by calling it a tax, relying on Congress's Constitutional taxing power, allowing it to be collected and enforced as a tax, or identifying revenue to be raised) so it can be "scrutinized" as a tax and Congress can accordingly be held accountable. They cannot, however, use a different linguistic with a perhaps secret understanding between themselves that the word, in fact, means something else entirely. As the First Circuit has explained, the integrity of the process must be guaranteed by the judiciary:

> In our republican form of government, legislators make laws by writing statutes—an exercise that requires putting words on paper in a way that conveys a reasonably definite meaning. Once Congress has spoken, it is bound by what it has plainly said, notwithstanding the nods and winks that may have been exchanged.... And the judiciary must stand as the ultimate guarantor of the integrity of an enacted statute's text.

*State of Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 699–700 (1st Cir. 1994).

### (8) For Constitutional purposes, it is a penalty, and must be analyzed under Congress's Commerce Clause power

For all the above reasons, I conclude that the individual mandate penalty is not a "tax." It is (as the Act itself says) a penalty. The defendants may not rely on Congress's taxing authority under the General Welfare Clause to try and justify the penalty after-the-fact. If it is to be sustained, it must be sustained as a penalty imposed in aid of an enumerated power, to wit, the Commerce Clause power. *See Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 393, 60 S.Ct. 907, 84 L.Ed.

1263 (1940) ("Congress may impose penalties in aid of the exercise of any of its enumerated powers"). Therefore, the Anti–Injunction Act does not deprive this court of jurisdiction. *See Lipke, supra,* 259 U.S. at 562, 42 S.Ct. 549 ("The collector demanded payment of a penalty, and [thus the Anti–Injunction Act], which prohibits suits to restrain assessment or collection of any tax, is without application."). I will next consider the rest of the defendants' jurisdictional challenges.

### B. Rule 12(b)(1) ("Lack of Subject Matter Jurisdiction") Challenges

The defendants raise two additional jurisdictional arguments: first, that the individual plaintiffs and the NFIB do not have standing to pursue Counts One and Two, and the state plaintiffs do not have standing with respect to Count Six; and second, that those same causes of action are not ripe.

### (1) Standing

The Constitution limits the subject matter of the federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The "irreducible constitutional minimum of standing" contains three elements: "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Granite State Outdoor Advertising Inc. v. City of Clearwater,* 351 F.3d 1112, 1116 (11th Cir.2003). The defendants appear to concede that (2) and (3) are present in this litigation, but contend that the plaintiffs

cannot establish an injury-in-fact. Accordingly, only element (1) is at issue here.

For purposes of ruling on the defendants' motion to dismiss, I simply need to examine the plaintiffs' factual allegations:

At the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

*Lujan, supra,* 504 U.S. at 561, 112 S.Ct. 2130 (quoting *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Thus, "mere allegations of

## JUDGMENT ENTRY PURSUANT TO RULE 54(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

### I. PROCEDURAL BACKGROUND

The Court previously issued a Memorandum Opinion and Order granting in part and denying in part defendants' motion to dismiss plaintiffs' second amended complaint. ECF 58. Specifically, the Court denied defendants' motion to dismiss Count 1 of plaintiffs' second amended complaint alleging that the Patient Protection and Affordable Care Act (ACT) violates the Commerce Clause in Article 1 of the United States Constitution, and granted defendants' motion to dismiss plaintiffs' claims that the Act violates plaintiffs' freedom of expressive and intimate association

guaranteed by the First and Fifth Amendments of the United States Constitution (Count 2), the due process clause of the Fifth Amendment of the United States Constitution (Count 3), and plaintiffs' constitutionally protected right to privacy (Count 4).[1]

Subsequently, the parties filed a joint notice that discovery was unnecessary and that the remaining issues in the case could be decided as a matter of law (ECF 59), and the Court established a briefing schedule for summary judgment motions on Count 1 of plaintiffs' second amended complaint (ECF 67). Plaintiffs and defendants timely filed motions for summary judgment (ECF 69 and 70, respectively). Each side opposed the others' motion (ECF 78 and 79). The Court recognizes that counsel for both sides have worked very hard to provide the Court with extensive briefing and exhibits in support of their respective positions on summary judgment.

### II. NO JUST REASON FOR DELAY OF APPEAL OF DISMISSAL OF COUNTS 2, 3 AND 4 OF PLAINTIFFS' SECOND AMENDED COMPLAINT

Rule 54(b) of the Federal Rules of Civil Procedure provides that when an action presents more than one claim for relief the Court may enter final judgment as to one or more, but fewer than all the claims, when the Court determines there is no just reason for delay. The discretionary power of a district court to enter a Rule 54(b) judgment may be exercised on the court's own motion.[2]

---

1. The Court's opinion and order is a final decision and completely disposes of Counts 2, 3 and 4 of the plaintiffs' second amended complaint.

2. There are a number of factors that a district court should consider in determining whether to certify an issue for appeal pursuant to Rule 54(b). Those factors include 1) the relationship between the adjudicated and unadjudicated claims, 2) the possibility that the need for review may be mooted by future develop-

ments in the district court, 3) the possibility that the appellate court may have to consider the same issue on appeal a second time, and 4) miscellaneous factors such as delay, economic considerations, expense, etc. *Corrosioneering v. Thyssen Envtl. Sys.,* 807 F.2d 1279, 1282–83 (6th Cir.1986); *Pittman v. Franklin,* 282 Fed.Appx. 418, 430 (6th Cir.2008) (citing *Corrosioneering v. Thyssen Envtl. Sys.*).

Rule 54(b) "is intended to strike a balance between the undesirability of more than one

■ In this case, the dismissed claims are entirely separate from the single remaining claim (Count 1). The Court's Memorandum Opinion and Order dismissing Counts 2, 3 and 4 is final and entirely disposes of those claims. Additionally, the nature of the constitutional challenges in Claims 2, 3 and 4 are independent from the constitutional challenge of Count 1, so the appellate court will not likely face the same issue a second time in the future.

Four district judges in Michigan, California, Virginia and Florida have ruled with mixed results on the constitutionality of the Act relative to the Commerce Clause, and those cases are already proceeding through the next level of review. The Court questions the relevance of any ruling it may make regarding the Commerce Clause issue given the more advanced stage of challenges to the Act in other jurisdictions and the ultimate impact of the appellate rulings in those cases on the instant case.[3] In any event, the plaintiffs' right for appellate review as to the Court's dismissal of counts 2, 3 and 4 remains.

Lastly, the Court finds that miscellaneous factors favor an immediate appeal of Counts 2, 3 and 4. In the Court's view, the litigants are best served by allowing an immediate appeal of the Court's dismissal of Counts 2, 3 and 4 given the uncertainty of the time period in which the constitutionality of the Act relative to the Commerce Clause will be determined in the federal courts. The plaintiffs are entitled to a timely challenge of this Court's dismissal of seventy-five percent of their second amended complaint.

The Court concludes that its prior dismissal of Counts 2, 3 and 4 is final, and that balancing all the factors to be considered in this case and the larger context of litigation surrounding the Act, there is no just reason for delaying the entry of final judgment with respect to Counts 2, 3 and 4 of plaintiffs' second amended complaint, and that final judgment should be so entered.

Therefore, for the reasons stated herein, and in the Court's Memorandum Opinion and Order dated November 22, 2010, IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendants' motion to dismiss Counts 2, 3 and 4 of plaintiffs' second amended complaint is GRANTED, and Counts 2, 3 and 4 of plaintiffs' second amended complaint is hereby DISMISSED WITH PREJUDICE. This Judgment Entry is certified and entered by the Court pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

---

appeal in a single action and the need for making review available in multiple-party or multiple claim situations at a time that best serves the need of the litigation." *Good v. Ohio Edison*, 104 F.3d 93, 95 (6th Cir.1997) (quoting *Day v. NLO, Inc.*, 3 F.3d 153, 155 (6th Cir.1993) (internal quotations and citations omitted)).

**3.** The Court acknowledges that the parties have submitted well-written motions for summary judgment on count 1. The submissions include the comprehensive and competing opinions of my colleagues in Michigan, California, Virginia and Florida. At this point in time, any additional ruling by this Court on the constitutionality of the mandatory provisions with regard to obtaining health insurance would fall into the realm of conjecture.